CLARK *v.* LUTHER McGILL, INC.

No. 41715     March 13, 1961     127 So. 2d 858

510

*W. Vol Jones, Jr.,* Waynesboro; *W. S. Murphy,* Lucedale, for appellant.

*Beard, Pack & Ratcliff,* Laurel, for appellee.

Gillespie, J.

C. A. Hurst Drilling Company, hereinafter called Hurst, is a drilling contractor engaged in the business of drilling oil wells and in connection therewith furnishes its own drilling rig and employs several drilling crews consisting of four men each in charge of a driller. The men under the driller are known as roughnecks, and the superintendent in charge of the drilling crews is known as the tool pusher. When the rig is to be moved to a new location, Hurst contracts with a hauler who moves the heavy equipment to the new location. Luther McGill, Inc., appellee here, hereinafter called McGill, is such hauler and was engaged by Hurst to move Hurst's heavy equpiment to a new location. Under the arrangements with Hurst, McGill moved all the heavy machinery and equipment and placed it at the exact location where the new well was to be drilled, after which Hurst's men would take over. The details of the contract between McGill and Hurst was not shown.

McGill had moved to the new location two steel substructures, each of which was about thirty feet long, four feet wide, nine feet high, and weighing about ten tons. These two substructures were to be placed by McGill at

the proper location and in proper relation to each other and connected with appropriate beams. The drilling rig is thereafter placed on the substructures thus located and put together. McGill had control of the hauling of this heavy equipment from the old location to the new one and the placing of the substructures at the new location. McGill furnished its own trucks, cables, chains, and other equipment used in this operation. It also employed its own help in the operation and carried workmen's compensation insurance.

The plaintiff below, appellant here, Archie B. Clark, was the general employee of Hurst. His job was that of rough neck. Appellant had helped McGill's truck driver in placing the first substructure in its proper place. Appellant then walked over to a nearby place and talked to Murray, who was Hurst's driller and appellant's immediate superior, while an employee of McGill, who was McGill's truck driver's helper, "bridled" the second substructure by attaching the cable and chain thereto so that McGill's gin-pole truck could hoist the second substructure into place. The proper way to bridle the substructure was to run the cable under it in the center and to use a chain to balance it. The proper function of the chain was to balance or guide the substructure rather than lift it. It was the function of the cable to bear the main weight of the substructure with the chain bearing only the difference if the two ends were not balanced. McGill's swamper improperly bridled the second substructure by rigging it so that the chain bore the weight of the substructure instead of merely guiding or balancing it. This second substructure had several tons of pipe in it so that the entire weight was about fourteen tons. Appellant did not see how the substructure was bridled because he was at another place talking to his driller, but went over to the substructure about the time it was rigged up so that he could render any assistance that McGill's men might need. McGill's truck driv-

er told appellant to get on one end of the substructure in order to balance it. Appellant did so and sat down on the lower beam thereof and when McGill's truck driver raised the substructure four or five feet off the ground the chain broke and the substructure fell with appellant on it. Appellant was seriously injured. There is no contention here that McGill's employees, the truck driver and swamper (or helper), were not negligent — the swamper for improperly bridling the substructure, and the truck driver for raising it when it was improperly bridled.

After appellant's injury he was paid workmen's compensation benefits by Hurst's compensation carrier and after about eight months, a lump sum settlement was consummated between appellant and Hurst's compensation carrier. Then appellant brought this suit against Luther McGill, Inc., appellee here. When the case came on for trial, the trial judge entered a directed verdict for appellee McGill, and appellant appealed to this Court.

The first and principal question for decision is whether appellant was at the time he was injured the employee of appellee, Luther McGill, Inc., for if he was the relationship of master and servant existed between them and under the provisions of the Workmen's Compensation Act appellant's exclusive remedy was under the provisions of that Act.

Section 6998-05, Mississippi Code of 1942, is, in part, as follows: "Exclusiveness of Liability. The liability of any employer to pay compensation shall be exclusive and in place of all other liability of such employer to the employee. . . ."

Section 6998-02, Mississippi Code of 1942, defines an employee as ". . . any person . . . . in the service of an employer under any contract of hire or apprenticeship, written or oral, express or implied."

When at the conclusion of plaintiff's case a motion is made to exclude the evidence and direct a ver-

dict for defendant, the court must look solely to the testimony in behalf of plaintiff and accept that testimony as true; and if the facts testified to, along with reasonable inferences which could be drawn therefrom, would support a verdict for plaintiff, the directed verdict should not be given. Williamson v. Inzer, (Miss.), 125 So. 2d 77. The facts in this case relating to whose employee appellant was when he was injured, when stated in the light of the foregoing rule, are as follows. Appellant was hired by Hurst and no one could fire him except Hurst's driller, appellant's immediate superior. He was paid by Hurst. According to custom, the rough necks of the drilling crew usually assisted the hauling contractor in setting the substructures when moving to a new location, and this was done in furtherance of Hurst's business, since it enabled the substructures to be set quicker, thus saving time. This assistance was a minor part of the moving operation for which McGill in this case was responsible, and what appellant did in this instance was in the nature of lending a helping hand to McGill's employees. Appellant was under the immediate control of McGill's truck driver to the extent he complied with the truck driver's instruction to get on the substructure to balance it, but there is nothing in the record requiring a finding that appellant consented to become the employee of McGill or that Hurst ever relinquished the supreme choice, control, and direction of appellant. McGill had the immediate control of the operation of locating and setting the substructures, but the general control of the premises was in Hurst, the substructures belonged to Hurst, and the work of locating and setting the substructures was, as to the final result and in all its detail, the work of Hurst.

Larson has a helpful discussion of the lent-employee problem. Section 48.10, Volume 1, Larson's Workmen's Compensation Law, is, in part, as follows:

"Although the lent-servant doctrine is a familiar one at common law, and has produced some of the most venerated and most intricate cases in the law of master and servant, it is necessary to stress once more that the workmen's compensation lent-employee problem is different in one significant respect: there can be no compensation liability in the absence of a contract of hire between the employee and the borrowing employer. For vicarious liability purposes, the spotlight was entirely on the two employers—what they agreed, how they divided control, how they shared payment, and whose work, as between themselves, was being done. No one paid much attention to the employee or cared whether he had consented to the transfer of his allegiance, since, after all, his rights were not usually as a practical matter involved in the suit. In compensation law, the spotlight must now be turned upon the employee, for the first question of all is: did he make a contract of hire with the special employer? If this question cannot be answered 'yes', the investigation is closed, and there is no need to go on into tests of relative control and the like.

"This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have been very vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit.

"In one sense, the lent-employee doctrine is not a separate doctrine at all. Theoretically, the process of determining whether the special employer is liable for compensation consists simply of applying the basic tests of employment set out earlier in this chapter. If they are satisfied, the presence of a general employer somewhere in the background cannot change the conclusion

that the special employer has qualified as an employer of this employee for compensation purposes.

"What gives the lent-employee cases their special character, however, is the fact that they begin, not with an unknown relation, but with an existing employment relation. The conflict of interest becomes one not between employer and employee (who is assured of recovering from someone) but between two employers and their insurance carriers. There is here no place for presumptions based on the beneficent purposes of the act. The only presumption is the continuance of the general employment which is taken for granted as the beginning point of any lent-employee problem. To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control the details of the work.

"The necessity for the employee's consent to the new employment relation stems, of course, from the statutory requirement of 'contract for hire', discussed in the preceding section. The consent may be implied from the employee's acceptance of the special employer's control and direction. But what seems on the surface to be such acceptance may actually be only a continued obedience of the general employer's commands. For example, when a general employer told claimant to help the employer's friends get a motorboat started, claimant's temporary compliance with the friend's directions was held to be nothing but the carrying-out of the general employer's initial instructions." See also Section 48.22, Ibid.

A leading case on the particular aspect of the lent-employee problem is Rhinelander Paper Company v. Industrial Commission, (Wis.), 239 N.W. 412, and it has

been cited and followed in numerous cases in other States. Some of these cases involving suits against the special employer by the loaned employee at common law are: Jeffrey Mfg. Co. v. Hannah, (Ala.), 105 So. 2d 672, and Southern Cement Company v. Patterson (Ala.), 122 So. 2d 386. In each of the Alabama cases cited the loaned employee was allowed to recover against the special employer against the contention that the special employer was his master. The facts in those cases are similar in principle to the present case. See also Fontenot v. National Transfer Co. (La.) 99 So. 2d 795, and Parkhill Truck Co. v. Wilson (Okla.), 125 Pac. 2d 203.

Numerous authorities and cases from this and other jurisdictions are cited by the parties which have more or less bearing on the question under consideration. Runnels v. Burdine Construction Co., 234 Miss. 272, 106 So. 2d 49, while not in point, is a good illustration of the rule appellee would have us apply in the present case. In the Runnels case, the loaned employee was held to be the servant of the special employer. Kelly was a dragline operator and Burdine leased the dragline and the services of Kelly to Longview Equipment Company. Longview had charge of the entire job and had the right to, and did, control and direct Kelly's work. Burdine was never on the job.

A loaned servant does not become the employee of the special employer unless a contract of hire is entered into between the employee and the borrowing employer. This contract may be express, or implied from all the facts and circumstances; but there must be consent thereto on the part of the employee, and this consent may be implied. The right to control the employee has been one of the dominant factors in all the cases, but the ultimate right to control should not be confused with immediate control, for it is the reserved right of control rather than its actual exercise that furnishes the true test of relationship; and he is master who has

the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results and in all its details, and the fact that the borrower gives information and directions to the servant as to the details of the work or the manner of doing it does not make the general servant of the employer the servant of the borrower. Southern Cement Co. v. Patterson, supra.

■■■ The evidence would fully justify a finding that appellant was not the employee of appellee.

Appellee contends that the directed verdict for appellee was justified because all employers engaged in a common project where workmen's compensation has been secured to the various employees working on the project are immune to common law action for damages brought by an employee injured on the project, regardless of who is the immediate employer of the injured employee at the time of his injury. This contention is without merit. Section 6998-36, Mississippi Code of 1942, provides in part as follows: "The acceptance of compensation benefits from or the making of a claim for compensation against an employer or insurer for the injury or death of an employee shall not affect the right of the employee or his dependents to sue any other party at law for such injury or death, . . ." This State is one of a majority of States where the immunity of the Act is granted the employer only. An injured employee may bring a common law action against any person except his employer. Other States have the rule contended for by appellee, but it is by statute. Section 72.32, Vol. 2, Larson's Workmen's Compensation Law, is in part as follows: ". . . an employee of the general contractor. . . . sues the subcontractor in negligence, the great majority of jurisdictions have held that the subcontractor is a third party amenable to suit." The cases so holding are numerous.

We are of the opinion that the other questions raised by the parties require no discussion.

Reversed and remanded.

*Lee, P. J.,* and *Kyle, Gillespie, Rodgers* and *Jones, JJ.,* concur.