## Index Drilling Company, Inc. *v.* Williams

No. 42142 February 5, 1962 137 So. 2d 525

776

*Beard, Pack, Ratcliff & Dillard,* Laurel, for appellant.

*F. B. Collins, Paul G. Swartzfager,* Laurel, for appellee.

ON CROSS-APPEAL.

APPELLANT IN REPLY.

ETHRIDGE, J.

Appellee, Charles Oree Williams, Jr., filed this suit in the Circuit Court, Second District of Jones County, Mississippi, against appellant, Index Drilling Co., Inc., for personal injuries. He recovered a verdict and judgment for $63,500. The principal questions involved are (1) interpretation of the third-party tort-feasor provisions of the Mississippi Workmen's Compensation Act, where the employee, after receiving compensation benefits, brings a third-party action against a corporation wholly owned by those owning his employer-corporation; (2) whether the lent-servant doctrine applies; and (3) the validity of the verdict, as to whether it was a quotient verdict, and grossly excessive.

## I.

The jury was warranted in finding for the plaintiff on the issue of liability. Williams was 18 years old on September 8, 1956, the date of the accident. At the time of trial he was 23 and unmarried. He was employed

by Production Service, Inc. (called Production). Production was one of five corporations wholly owned by C. F. and L. H. Martin. Until April 1956, they had operated as a co-partnership engaged in servicing, trucking and drilling operations in oil fields. At that time the partners organized five separate corporations, including Production, and transferred their interests to these five corporations: Production Service, Inc., Dapsco, Inc., Index Drilling Co., Inc., the defendant (called Index), Marmiss Supply Co., Inc., and C. F. Martin, Inc. The partners were the sole officers, directors and stockholders. Plaintiff was employed by Production. He was on its payroll and thus was paid by it.

On the day of the accident, Williams had worked for Production on a home in the City of Laurel until about 3 p.m., when he went to the office of Dapsco, Inc., at the air base in Laurel, where the main offices and field offices of the five corporations are located. Kervin Hall, of the Dapsco office, instructed him to help unload a truck and put some drill pipes and pipe racks on another one. Williams went to the truck, which had a sign on its door, "Index Drilling Co., Inc." The truck driver was Thaddeus Anderson, an employee of Index. The trailer contained drill pipes about 30 feet in length, and large pipe racks made in a triangular shape and weighing about 1,000 pounds each. James Knight, an employee of Production, was present on the float or trailer which was being unloaded. Harry (Rudolph) Walters said he was employed by Dapsco, Inc., as field superintendent for the entire operation. The pipe racks were to be picked up with a crane or winch mounted upon the truck driven by Anderson, an employee of Index.

According to plaintiff's testimony, Knight hooked the chain around two racks, and the hoist on Anderson's truck, under his control, lifted them and set them on a concrete floor. One rack was sitting on its base and the

other was leaning against it. Anderson told Williams to unhook the hoist line from the racks, and Williams did that. Anderson then started the crane and winch line, picking it up. This "jarred against that rack and knocked it over." The pipe rack fell on plaintiff's foot, resulting in the injuries for which he sought damages.

Williams said that he never worked for or agreed to work for Index. Index never paid him for any work. When he returned to the air base, he reported to, Hall, employed by Dapsco, Inc., because that was the custom. When he reached the truck, Harry Walters, head foreman for Production, was present along with Knight and Anderson. Walters told him to stay on the ground, and to unhook the line from the racks. Anderson was on the truck operating the crane. Anderson picked up two racks together, laid them down once, then picked them up, and set them down again. Anderson then told him to go ahead and unhook the line from the racks. Plaintiff said he did what Hall instructed him to do. When Index's truck driver, Anderson, told him to unhook the line, he did. When the crane picked the racks off the float, Walters left going toward the office, and was not present when plaintiff was hurt.

James Knight said he was working under Walters' direction, but that Anderson told him to hook the racks together, and instructed Williams to unhook the lines, which Williams did. Anderson was looking through the back window of the truck and could see what was going on. After the driver told plaintiff to unhook the line, but before he could move out of the way, the rack fell on his foot. Knight denied he had given Anderson the signal to move on.

On the other hand, Anderson said that after he had set down the racks, Williams, who was "swamping" for him, unhooked the line and gave him the signal to pull away. He admitted that Walters was not present when plaintiff unhooked the racks; that when he did

this, it was either on his own or Anderson's direction. He was looking out the back window of the truck. He knew that, when he lowered two racks at once, one of them would be at an angle. He said that Williams was in the right place to unhook the lines, but denied telling him to unhook them.

Walters was on a truck about 100 feet away checking drill collars on pipes, when he looked over and saw the racks in their positions, which he knew "were dangerous and would fall", so he called to Williams to move out of the way, but about that time they fell. He did not know whether Anderson gave plaintiff orders to unhook the line or plaintiff told Anderson to move the truck.

From this summary of the evidence, the following were manifestly questions for the jury: Whether the employee of Index, its truck driver, Anderson, negligently and carelessly started the crane in operation before plaintiff could get out of the way, and as a proximate result of such negligence, Anderson caused the rack to fall on plaintiff's foot; whether it was negligent to unload two of the racks at one time, and, if so, whether plaintiff's injuries were a proximate result of such negligence; and finally, the issue of Williams asserted contributory negligence.

## II.

After Williams was injured, he received under the Workmen's Compensation Act temporary total disability benefits for 39 weeks, an award of 65-4/7 weeks for permanent partial disability, for 50 per cent loss of use of the left foot, and hospital and medical expenses. In August 1959, he filed with the Workmen's Compensation Commission, under Sec. 9(i) of the Act, a petition for authority to make a compromise lump sum settlement with his employer, designated as Martin's Connection Works and Welding Shop, being one and the same as Dapsco, Inc. The petition averred that a "steel plate"

had fallen on his left foot, which resulted in "amputation of the big toe and the second toe of that foot, and that he received other personal injuries;" that claimant had reached maximum recovery, and a settlement had been agreed upon, by which, in addition to benefits already paid, claimant would receive $2,300 plus $355.10 medical expenses; and that claimant desired to settle and compromise all of his claims under the act.

On September 1, 1959, the Commission entered an order finding that the proposed settlement was fair, reasonable, and to claimant's best interest, and approving it. On September 5, 1959, Williams executed a release to "Martin's Connection Works and Welding Shop (Dapsco, Inc.)" and Maryland Casualty Company, the compensation insurance carrier, pursuant to this 9(i) settlement.

■■■ The instant action was filed in April 1960, under the authority of the third-party-action provision of the Miss. Workmen's Compensation Act. Miss. Laws 1948, Ch. 354, Sec. 30; Miss. Code 1942, Rec., Sec. 6998-36. Section 30 provides that the acceptance of compensation benefits shall not affect the employee's right to sue any other party at law for such injury or death, but, if the employer or insurer join in such action, they are entitled to be reimbursed for compensation benefits paid by them from the net proceeds of the suit.

In short, under Sec. 30 acceptance of compensation benefits from an employer does not affect the employee's right "to sue any other party at law for such injury or death". The immunity from all liability except compensation benefits applies only to the employer and insurer. Tort liability remains as to "any other party". Section 5 of the Act (Code Sec. 6998-05) states that the liability "of an employer to pay compensation shall be exclusive". The limitation of liability and immunity from tort liability applies only to an employer.

Nevertheless, appellant contends that it is immune from this suit at common law, because it is not a third party within Sec. 30. It is argued that each of the five corporations simply constituted a department or division of the over-all enterprise. The Martins owned and operated all of them; contracts were taken only in the name of Dapsco, Inc., and all invoicing was done in its name. Plaintiff was assigned by Hall, an employee of Dapsco, Inc., to help unload the truck. Hence it is said there was such an identity of ownership, operation, purposes and activities that each of the five Martin corporations was the *alter ego* of the other, jointly engaged in mutual activities; that the legal fiction of corporate entities should be disregarded under these circumstances. The several Martin corporations constituted but a single employing entity. Defendant raised this issue by incorporating in its answer certain special defenses, which were struck by the circuit court on motion of plaintiff. We find no error in that action.

Section 30 of the Workmen's Compensation Act preserves a compensation claimant's right of action against ''any other party at law'', except the employer or insurer. Immunity from tort liability is confined by Sec. 5 to the employer. Plaintiff's employer was Production, not the defendant, Index. The Martins elected to conduct their operations by means of five corporate entities, and to have Production employ Williams, not Index. The common employment doctrine, which is established in Massachusetts and perhaps a few other states, is not applicable in this instance. See 2 Larson, Workmen's Compensation Law (1961), Secs. 72.30-72.40. The Mississippi Workmen's Compensation Act limits the immunity from tort liability to the employer and carrier. The related activities of these five corporations would not warrant disregard of their separate corporate entities, particularly in view of the provisions of the Mississippi Act. National Surety Corp. v. Kemp, 217

Miss. 537, 64 So. 2d 723, 65 So. 2d 840 (1953), and U. S. F. & G. Co. v. Collins, 231 Miss. 319, 95 So. 2d 456 (1957), do not indicate a contrary view. Whether the common employment doctrine should be adopted is a legislative question. The present statutes confine immunity from tort liability to the claimant's employer. Index was not Williams' employer, so we hold that he had a right to sue Index as a third-party tort-feasor.

## III.

■■ Appellant asserts, further, that Williams could make only a Workmen's Compensation claim against it, because he was loaned to it by Production Service, Inc., and that at the least the trial court erred in refusing defendant's requested instructions to the effect that, if the jury found plaintiff was its lent-servant at the time of his injury, he could not recover. The lent-servant doctrine has no application in this case. The evidence did not warrant submitting that issue to the jury.

Clark v. Luther McGill, Inc., 240 Miss. 509, 127 So. 2d 858 (1961), thoroughly examined the problem. There it was held the trial court erred in granting a peremptory instruction for defendant, the alleged third-party tortfeasor, and that whether an oil field roughneck was the lent-employee of the defendant was, under those circumstances, a question of fact for the jury. Mississippi is one of a majority of states where the immunity of the compensation act is granted the employer only. The opinion said:

"A loaned servant does not become the employee of the special employer unless a contract of hire is entered into between the employee and the borrowing employer. This contract may be express, or implied from all the facts and circumstances; but there must be consent thereto on the part of the employee, and this consent may be implied. The right to control the employee has

been one of the dominant factors in all the cases, but the ultimate right to control should not be confused with immediate control, for it is the reversed right of control rather than its actual exercise that furnishes the true test of relationship; and he is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results and in all its details, and the fact that the borrower gives information and directions to the servant as to the details of the work or the manner of doing it does not make the general servant of the employer the servant of the borrower."

In *Clark* it was said there is a presumption of the continuance of the general employment. To overcome this presumption there must be "a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee, proof that the work being done was essentially that of the special employer, and proof that the special employer assumed the right to control the details of the work."

*Clark* was followed in Rowell Equipment Co., Inc., v. McMullan, 133 So. 2d 631 (Miss. 1961). An employee of an equipment company, which had contracted to repair machinery for an oil company, was not, when injured while repairing such machinery, an employee of the oil company, although the latter could direct him where to work and what machinery to repair. This contention was raised by the equipment company, in a claim made against it by the employee. It was held that the injured worker was the employee of the equipment company, which had the ultimate right to control him under a contract of hire. The Court cited with approval *Clark,* and noted again that, where the lent-servant doctrine is presented, the first question is whether the employee made a contract of hire with the special

employer; that there is a presumption of continuance of the general employment, which remains in the absence of a clear demonstration that a new temporary employer has been substituted for the old under a contract with the special employer.

In the instant case, it is manifest that Williams was the employee of Production, and he did not either expressly or impliedly enter into a contract of hire temporarily with Index. See Miss. Code 1942, Rec., Sec. 6998-02(4). Williams was paid by Production, and his general foreman was Walters, an employee of Dapsco, Inc., but directing Production's work. Plaintiff did not agree to be an employee of Index, and was not paid any compensation by Index. He simply was told by his superior to help unload a truck, which he found was an Index truck when he went to the location of the unloading. In short, the evidence is not sufficient to indicate as a jury issue that a new temporary employer had been substituted for the old one, or that a contract was made between Index as special employer and the employee. There was no showing of a deliberate and informed consent by the employee to a new employment. Hence the trial court was correct in refusing to submit to the jury the issue of Williams' being the lent-servant of Index.

## IV.

■■■ Appellant contends that the verdict of the jury is invalid because it was a quotient verdict. A quotient verdict may be defined as one resulting from an agreement whereby each juror writes down the amount of damages to which he thinks the party is entitled. These several amounts are added together and divided by the number of jurors. The quotient thereby obtained is accepted as the amount of the verdict. Annos., 52 A.L.R. 40 (1928); 73 A. L. R. 93 (1931); 20 A. L. R. 2d 958 (1951) (quotient arbitration award); 39 A. L. R. 2d

1208 (1955) (quotient condemnation report or award by commissioners) ; 53 Am. Jur., Trial, Secs. 1030-1032; 89 C. J. S., Trial, Sec. 472. Such verdicts are held to be invalid. ██ █ The test is whether the jury agreed beforehand to be bound by the result reached. 53 Am. Jur., Trial, Sec. 1031. Such a prior agreement precludes subsequent reconsideration, and results in a sum which is not the result of the deliberate judgment of the jury. Parham v. Harney, 6 S. & M. 55, 14 Miss. 55 (1846). (Hn 6) However, the evidence must show affirmatively that the jurors agreed in advance to the return of such a verdict. Buckeye Cotton Oil Co. v. Owen, 122 Miss. 14, 84 So. 133 (1920) ; City of Meridian v. Bryant, 232 Miss. 892, 100 So. 2d 860 (1958).

There is no affirmative showing in the instant case that the jurors agreed in advance to return a quotient verdict. The motion of plaintiff to strike affidavits of eleven of the jurors was properly sustained. ██ █ Jurors cannot impeach a verdict duly rendered by them. Their affidavits introduced for such purpose will be disregarded. 89 C. J. S., Trial, Sec. 523; City of Meridian v. Bryant, *supra.* Nor was the testimony of the insurance adjuster as to what the jurors told him admissible. This left in evidence only the slip of paper found in the jury room about fifteen minutes after the verdict, and the proffered testimony of the circuit clerk as to what the figures reflected on the sheets handed the clerk when the verdict was returned. ██ █ Hence there is no affirmative evidence that the jurors agreed in advance to return the quotient as their verdict. As stated in the *Buckeye* case, the quotient method may have been used by the jury merely as an experiment. The established rules protecting integrity of a jury verdict are strigent and difficult to overcome, but they have a sound basis in the administration of justice, and should not be relaxed in this instance. Hence appellant failed to meet its burden of proof, to show affirmatively

a prior agreement by the jurors to accept the quotient as their verdict.

■■ Appellant contends that the verdict is so grossly excessive that it evinces bias, passion and prejudice on the part of the jury, and that therefore the trial court erred in not granting appellant's motion for a new trial. We agree with that position. The verdict was for $63,500, for injuries to the left foot. The large pipe rack fell on Williams' foot, and resulted in the amputation of the big toe and the second toe. There is no medical testimony in this record. We do not know whether the rack broke any bones in plaintiff's foot. There is no evidence that it did. There is no evidence that the accident directly damaged any other parts of his leg, except plaintiff's statement that his left leg was weaker than his right and the muscles had atrophied to some extent. There is no evidence that the injuries to his foot permanently damaged the remainder of his body, except plaintiff's evidence that he had and continued to have pain in the foot, the injuries affected his sleep, and resulted in a loss of weight. There is no medical evidence as to a prognosis of continued pain in the foot, or the use of the foot. At the time of this incident, plaintiff was 18 years of age, with a life expectancy of 48.32 years.

■■ Plaintiff had the burden of proof on the extent of loss and damages. McCormick, Damages (1935), Secs. 14, 86, 88. See 2 Harper and James, The Law of Torts (1956), Secs. 25.1-25.5, 25.8-25.12. To support a verdict in this very large sum, the evidence should cover, among others, the above-stated matters. On these and some other aspects of plaintiff's damages, the jury had and this Court has principally conjecture and speculation.

After amputation of two toes, plaintiff said that he had two other operations, one in which the doctor "removed some nerves" and another "on the end of where the second toe was cut off." These ambiguous, lay de-

scriptions of the operations are of little value. Williams was in the hospital after the injury for 36 days, on another occasion for 16 days, and another for 6 days. During the interim period, he was not able to work for a while, and then he worked for six months and later for three months for two other Martin corporations. Subsequently, he worked for a ten-cent store and a finance company, and at the time of trial was working as collector for another finance company. His evidence on loss of earnings reflects that, while working for Production, he averaged $70-$80 a week. On his present job, he earned $45 a week, with $10 car expenses. Although he said he ''nets'' only $100 a month, that statement is meaningless standing alone. However, his testimony reflected loss of earnings. Working for a finance company, he said he worked 5½ days a week, covering 100 miles a day or 600 miles a week in his car. Williams stated that, with the loss of two toes, he has difficulty balancing himself when walking on an irregular surface, and must walk somewhat on the side of his foot. He exhibited his foot to the jury.

Williams graduated from high school, and has had about one year in a junior college. Knight, a co-worker, and plaintiff's father said that before the accident he was healthy and able-bodied. His father testified that since then he has considerable pain in his foot and difficulty with sleeping, resulting in the loss of weight.

We have considered carefully the testimony on this issue of damages, and have concluded that the jury's verdict is grossly excessive. The evidence does not support a finding of damages in the amount of $63,500 for these injuries to plaintiff's foot, with the resulting pain and loss of earnings. ██ ██ Mathematical computations of estimated loss of earnings for one's life expectancy are relevant and persuasive, but do not suffice to support this large sum for Williams' injuries. ██ ██ Hypothetical figures for pain and suffering are per-

missible argument, but not relevant evidence. The record reflects that the compensation insurance carrier paid plaintiff's medical and hospital expenses. A plea to that effect by the defendant was struck on motion of plaintiff. Plaintiff thereafter declined to introduce that evidence on medical expenses.

Since the judgment will be reversed on the amount of damages, the cross-appeal raising this and other issues is moot, and will be dismissed. The judgment of the circuit court is affirmed on liability, and reversed on damages. The cause is remanded for a new trial on the issue of damages only. Supreme Court Rule 13. In the new hearing as to damages, all facts may be presented to the jury on the question of negligence of all parties, including plaintiff, and the jury will have the right to apportion damages under the comparative negligence statute. Vaughan v. Bollis, 221 Miss. 589, 73 So. 2d 160 (1954); Williams v. Clark, 236 Miss. 423, 110 So. 2d 365 (1959); Jenkins v. Cogan, 238 Miss. 543, 119 So. 2d 363 (1960); Carlisle v. Cobb Bros. Construction Co., Inc., 238 Miss. 681, 119 So. 2d 918 (1960).

On direct appeal, affirmed on liability, and reversed and remanded for new trial as to damages only; on cross-appeal, dismissed.

*McGehee, C. J.,* and *Arrington, McElroy,* and *Rodgers, JJ.,* concur.