# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-CA-01759-SCT

*KATHY A. DEARMAN*

*v.*

*RON CHRISTIAN, M.D.*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/11/2006 |
| TRIAL JUDGE: | HON. JOSEPH H. LOPER, JR. |
| COURT FROM WHICH APPEALED: | ATTALA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT LEWIS SPELL |
| | G. TODD BURWELL |
| | WILLIAM LARRY LATHAM |
| ATTORNEYS FOR APPELLEE: | JOHN LEWIS HINKLE, IV |
| | CHRIS J. WALKER |
| NATURE OF THE CASE: | CIVIL - MEDICAL MALPRACTICE |
| DISPOSITION: | AFFIRMED - 08/23/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., EASLEY AND GRAVES, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

**STATEMENT OF THE CASE**

¶1. This case involves a partial summary judgment in favor of Dr. Ron Christian (Dr. Christian) on the issues of vicarious liability and negligent supervision.[1] On February 15, 2001, Kathy Dearman (Dearman) filed suit pursuant to the Mississippi Tort Claims Act

---

[1] The trial court's order and opinion and partial summary judgment as to separate defendant Ron Christian, M.D., provided that pursuant to Rule 54(b) of the Mississippi Rules of Civil Procedure there is no just reason for delay and expressly directed the entry of a final judgment against the separate defendant, Ron Christian, M.D.

(MCTA) against Montfort Jones Memorial Hospital (the Hospital) and Dr. Christian in the Circuit Court of Attala County, Mississippi. In her complaint, Dearman asserted claims for medical malpractice and negligence against Dr. Christian and vicarious liability and negligence against the Hospital. Dr. Christian was the Hospital's radiologist who was employed on a contractual basis.

¶2. On May 31, 2000, Dearman went to the Hospital to have testing conducted for back and flank pain. The testing required imaging services in the form of administration of a contrast solution into her left arm. The radiology technician, Herbert Hill, injected the contrast dye into Dearman's arm. Thereafter, Dearman's arm began to swell due to extravasating (the flow of fluid into tissue). As a result of these actions, Dearman had to undergo surgery to open her arm and drain the contrast dye, as well as surgery to graft skin onto her arm at the incision site.

¶3. On August 3, 2005, Dr. Christian filed a motion for partial summary judgment on the issues of vicarious liability and negligent supervision. On August 21, 2006, the trial court rendered an oral decision granting partial summary judgment to Dr. Christian. Following this ruling, the trial court also entered an order and opinion for partial summary judgment as to the separate defendant, Dr. Christian, on September 14, 2006. The trial court found that (1) Dr. Christian was not vicariously liable under the theory of respondeat superior, and (2) Dr. Christian was not liable for the claim of negligent supervision, since there was no evidence that he was present at the time of Dearman's procedure, and there was no evidence that he exercised control or supervision over the Hospital's staff. The trial court also entered a final

2

judgment of dismissal with prejudice, dismissing the vicarious liability and negligent supervision claims against Dr. Christian only.

¶4. On October 4, 2006, Dearman timely filed an appeal to this Court.

**FACTS**

¶5. Dearman was referred by her physician, Dr. Thaggard, to the Hospital to have a CT scan procedure. She arrived at the Hospital's emergency room on May 31, 2000, at approximately 8:00 a.m. On the day of the procedure, the emergency room nurse inserted a needle into Dearman's arm with a Hep-Lock, a type of catheter, attached to it. Dearman was given some Benadryl by the emergency room nurse prior to her arrival at the radiology department. She then went to the radiology department at approximately 8:30 a.m. Herbert Hill (Hill) was the x-ray technician who performed the procedure on Dearman. Hill never inserted a needle into Dearman's arm.

¶6. Hill stated that he checked the Hep-Lock in Dearman's arm by flushing it with saline solution. Hill then gave Dearman some of the contrast solution through the catheter and asked her if she experienced any pain. Hill stated that Dearman told him that she was doing okay. Then Hill injected more of the contrast solution. Hill again asked Dearman again if she felt any pain or pressure. Hill stated that Dearman told him that everything was okay.

¶7. Christopher Threadgill, the director of radiology at the Hospital, stated that he supervised Hill, and that Hill was his employee. Threadgill was present when Hill began the procedure and administered the first syringe of the contrast fluid and asked Dearman if she felt any pain, swelling, or burning with the injection. Then, Threadgill pushed the start

3

button for the scanner and saw Hill insert the second syringe. Threadgill again heard Hill ask Dearman if she felt any pain, swelling, or burning with the injection. Threadgill stated that Dearman reasserted that she was not in any pain. Thereafter, Threadgill left the room. Hill later told Threadgill that he had flushed the IV with saline solution.

¶8. However, Dearman's deposition testimony contradicted Hill when she stated that her arm began to hurt almost immediately after she had to raise her arms for the procedure. She said her arm felt like it was being crushed. Dearman said she told the lab technician that her arm hurt and something was wrong. She said her arm became "puffy" and began to swell.

¶9. Thereafter, Dr. Christian arrived in the x-ray room and examined Dearman's arm. Dr. Christian administered some warm soaks and periodically checked Dearman's arm. When Dearman's arm did not improve, Dr. Christian went with Dearman to Dr. Thaggard's office.

¶10. Dearman stated that she left the hospital around 12:00 p.m. and walked to Dr. Thaggard's office with Dr. Christian. Dr. Thaggard stated that he was going to call a surgeon. Dr. Thaggard then told Dearman to call her husband, go home, pack her bags, and meet him at 3:00 p.m. Dearman stated that her arm began to get pink and later turned a pale blue and then became more and more blue. She said the arm had been blue for a long time before she arrived at Dr. Thaggard's office with Dr. Christian. Dearman underwent surgery to drain the contrast from her arm.

¶11. Following the trial court's grant of partial summary judgment, Dearman appealed to this Court.

## DISCUSSION

4

¶12.    This Court set forth the standard of review for summary judgment, as follows:

"We employ the de novo standard in reviewing a trial court's grant of summary judgment." ***Brown v. J.J. Ferguson Sand & Gravel Co.***, 858 So. 2d 129, 130 (Miss. 2003) (citing ***O'Neal Steel, Inc. v. Millette***, 797 So. 2d 869, 872 (Miss. 2001)).    The moving party shall be granted judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Miss. R. Civ. P. 56(c).

"Summary judgments, in whole or in part, should be granted with great caution." ***Brown***, 444 So. 2d at 363.    However, "[s]ummary judgment is mandated where the respondent has failed 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" ***Wilbourn v. Stennett, Wilkinson & Ward***, 687 So. 2d 1205, 1214 (Miss. 1996) (citing ***Galloway v. Travelers Ins. Co.***, 515 So. 2d 678, 683 (Miss. 1987) (quoting ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

***Smith v. Gilmore Mem. Hosp., Inc.***, 952 So. 2d 177 (Miss. 2007).

¶13.    Dearman argues that the trial court erred by granting partial summary judgment to Dr. Christian on the issues of vicarious liability and negligent supervision, as there were genuine issues of material fact.    It is important to note that any allegations of medical negligence by Dr. Christian after the extravasation occurred are not before the Court.    The trial court ruled only on the limited issues of vicarious liability and negligent supervision, holding as follows:

4.    The evidence is undisputed that Dr. Christian was employed as an **independent contractor** of Montfort Jones Memorial Hospital on May 31, 2000.  It is undisputed that Dr. Christian was **not the employer of any of the Montfort Jones' employees involved in the treatment of the Plaintiff on May 31, 2000.**

5.    Further, Mississippi law provides that "[t]he routine acts of treatment of which an attending physician may reasonably assume may be performed in his absence by nurses of a modern hospital as part of their usual and customary

duties and execution of which does not require specialized medical knowledge, are administrative acts for which negligence in their performance is imputable to the hospital." ***Hunnicutt v. Wright***, 986 F.2d 119, 123 (5th Cir. 1993).

6.      The facts in this case demonstrate that the employees of Montfort Jones routinely administered contrast in Dr. Christian's absence.  Further, the act of administering contrast was a duty that Dr. Christian could reasonably assume could be performed in his absence.

7.      Given the facts presented, Dr. Christian cannot be vicariously liable for the actions of the Montfort Jones' employees who provided treatment to the Plaintiff on May 31, 2000.

8.      Similarly, **under the theory of negligent supervision, there was not evidence presented by the Plaintiff that created a genuine issue of material fact as to the Plaintiff's assertion that Dr. Christian was present at Montfort Jones Memorial Hospital during the administration of contrast by the Montfort Jones employees on May 31, 2000.**

9.      There was also **no evidence presented by the Plaintiff that Dr. Christian was even aware that the Plaintiff's procedure was scheduled for the morning of May 31, 2000, or that Dr. Christian had delegated any responsibilities to the Montfort Jones' employees as his agents** on May 31, 2000, in regards to the administration of contrast to the Plaintiff.

10.     As such, there is **no credible evidence that Dr. Christian exercised direction, control or supervision over the Montfort Jones employees involved in the treatment of the Plaintiff on May 31, 2000.**

11.     For the reasons set forth above, the Court finds and determines that pursuant to Rule 54(b) of the Mississippi Rules of Civil Procedure there is no just reason for delay and expressly directs the entry of Final Judgment of Dismissal with Prejudice as the claims of vicarious liability and negligent supervision by the Plaintiff, Kathy A. Dearman, against the Separate Defendant, Ron Christian, M.D.  All other claims of the Plaintiff remain outstanding.

(Emphasis added).

**I.      Vicarious Liability.**

6

¶14.    Dearman argues that the trial court erred by finding that Dr. Christian was not vicariously liable for actions of the radiology department employees. She relies on *Winters v. Wright*, 869 So. 2d 357, 367 (Miss. 2003), for the proposition that Dr. Christian would be vicariously liable for negligent acts of non-employees if performed pursuant to the direction and control of the physician. She claims that Dr. Christian did exercise direction and control over the radiology technician who injected the contrast into her arm.

¶15.    Dr. Christian argues that none of the Hospital staff was under his direction or control. He asserts that he was not even aware that Dearman was having the procedure performed, and he was not present at the Hospital at the time of the procedure. In addition, Dr. Christian maintains that he does not have a twenty-four-hour-a-day, seven-day-a-week duty to supervise Hospital employees according to *Partin v. North Mississippi Medical Center*, 929 So. 2d 924, 936 (Miss. Ct. App. 2005), *cert. denied,* 929 So. 2d 923 (Miss. 2006). Furthermore, Dr. Christian contends that the trial court was correct in finding that the procedure performed by Hill was a "routine act" pursuant to *Hunnicutt v. Wright*, 986 F. 2d 119, 123 (5th Cir. 1993).

¶16.    In *Winters*, the plaintiff suffered what she described as burns to her buttocks and thigh as a result of a heating blanket used on her during surgery. *Winters*, 869 So. 2d at 359. A jury found in favor of the defendants. *Id*. at 361. On appeal, this Court found that two instructions pertaining to vicarious liability were not in conflict. *Id*. at 366-67. In its reasoning, this Court held:

In applying Mississippi law, the Fifth Circuit stated that "the law imposes liability on a physician for the negligence of a nurse only if the nurse committed the negligent acts or omissions pursuant to the direction and control of the physician." *Hunnicutt v. Wright*, 986 F. 2d 119, 124 (5th Cir. 1993).

*Id*. at 367. This Court also reasoned as follows:

If Dr. Wright had directed the acts or had a right to do so, then it follows that he knew or should have known about them.

Dr. Wright testified repeatedly that he was unaware that the blanket was on the table. Further, operating room technicians and nurses testified that the heating blanket stayed on the table in that particular operating room and that it was routinely used by the nurses without direction by the physician. As the Fifth Circuit has stated,"the routine acts of treatment which an attending physician may reasonably assume may be performed in his absence by nurses of a modern hospital as part of their usual and customary duties, and execution of which does not require specialized medical knowledge, are merely administrative acts for which negligence in their performance is imputable to the hospital." *Hunnicutt*, 986 F. 2d at 123 (citing *Clark v. Luther McGill, Inc.*, 240 Miss. 509, 127 So. 2d 858, 861 (1961)). Thus, there must be some connection be it actual or imputed knowledge of the negligent act by the physician. We find this allegation of error to be without merit.

*Id*.

¶17. In *Partin*, 929 So. 2d at 936, the Court of Appeals affirmed summary judgment in favor of Dr. Sharp on a theory of vicarious liability. Dr. Sharp was Partin's treating physician, however, prior to Partin's death, Dr. Sharp informed the family that he would be going out of town and that Dr. Gray would be on-call for him. *Id*. at 935. During Dr. Sharp's absence, Partin died. *Id*. at 928. The evidence showed that Dr. Sharp was off-duty and off-call at the time of Partin's death. *Id*. at 935.

8

¶18.    The Court of Appeals recognized that the law provides for a "non-delegable duty upon physicians in the care and treatment of their patients." *Partin*, 929 So. 2d 936. The court further held:

> [W]e do not believe that this non-delegable duty should be understood to create vicarious liability for a doctor who is off-duty, off-call, and out of town at the time that an on-duty, on-call doctor commits malpractice. Such an understanding of the idea of "non-delegable duty" would have extremely negative policy implications.

*Id*. The Court of Appeals also rejected "Partin's argument that a physician's non-delegable duty, by itself, imposes vicarious liability on an off-call doctor for the malpractice of the on-call doctor serving in his or her place." *Id*.

¶19.    Here, deposition testimony was taken from Dearman, Dr. Christian, Hill, Threadgill, and Hospital Administrator Joseph Bland. The witnesses were questioned about Dr. Christian's duties as the Hospital's radiologist and his supervision of the radiology staff. Bland, stated that Dr. Christian was an independent contractor and the medical director of the radiology department. Dr. Christian read and interpreted all the x-ray films for the Hospital. Bland stated that Dr. Christian was not responsible for the supervision and training of the Hospital radiologist staff. In addition, Dr. Christian provided the radiology staff with Hospital policies and procedures; however, the Hospital, not Dr. Christian, made the policies and procedures. Bland stated that Threadgill was the chief technologist and that he reported to Dr. Christian.

¶20.    Threadgill stated that he was the director of radiology. In addition, Hill was Threadgill's employee. Threadgill also stated that anytime that Hill was at the Hospital, he

9

supervised Hill. When questioned further about the supervisory capacity in the radiology department, Threadgill described Dr. Christian's and his duties as follows:

> Dr. Christian is the radiologist, and he's the radiation safety officer. And some of the technical aspects, as far as – I'm the director of radiology, so we have, I guess, joint as far as he's the doctor that sets up every – as far as the (sic) okays most everything, but it's a joint effort, I guess, between me and him.

On the day of Dearman's procedure, Threadgill stated that he was present for the beginning of the procedure. Threadgill stated that he supervised Hill when the contrast material was injected into Dearman. Threadgill clarified this answer and stated:

> I was in there when he gave the first 50 cc's, so I guess I would be supervising as far as the first part. He, himself, was monitoring the second 50 cc's, and the ER physician would have been on standby if there was any kind of allergic reaction, or any kind of complication.

Threadgill also stated "I would be a supervisor anytime that [Hill] was here." Threadgill also confirmed that the regular Hospital procedure was to contact an emergency room doctor if there was no doctor present in the radiology department.

¶21. Dr. Christian stated that he did not consider himself to be an employee of the Hospital. He said he was paid on a per-exam basis by the Hospital and carried his own medical malpractice insurance. Dr. Christian stated that Hill was not his employee and he assumed that Threadgill was an employee of the Hospital. Dr. Christian also stated that he did not train anyone in the radiology department for procedures such as venipuncture. Dr. Christian said that on the day of Dearman's procedure, he did not know she was going to have the procedure; he was not at the Hospital during the procedure; and he did not oversee her diagnostic test. He also stated that either the emergency room doctor or the attending

10

physician would have overseen Dearman's injection. When Dr. Christian was questioned about the supervision of Hill and Threadgill, the following exchange occurred:

> Q. Well, if they're going to – who's responsible for [Hill's and Threadgill's] supervision? Inserting an IV for a diagnostic test, who oversees what they do?
> **A. When I'm there I do.**
> Q. And what if you're not there?
> A. I don't know.

(Emphasis added).

¶22. When questioned about who supervised or oversaw the procedure, Hill stated that an emergency room doctor oversaw the procedure. He stated that when the radiologist was not at the hospital, the normal hospital procedure was to call the emergency room doctor prior to injecting the patient with the contrast solution. In his deposition testimony, Hill was questioned about who was in charge of Dearman's procedure, and the following exchange occurred:

> Q. Who was in charge of overseeing the procedure?
> **A. The emergency room physician.**
> Q. Who was the emergency room physician at the time?
> A. I don't know who the doctor was that day. I just – I don't know what his name – who was in the department that day.
> Q. Do you know if he was at the hospital during the time the procedure was performed?
> A. Yes, ma'am.
> Q. He was?
> A. The emergency room physician – when the radiologist is not in, we call the emergency room physician, let him know that we have a patient in CT that we're about to inject an IVP contrast, and he say[s], Okay, go ahead. I'm standing by.
> Q. When did you call the ER doctor?
> A. Just before we inject the patient.

11

(Emphasis added).

¶23. Dr. Christian stated that he did not know that Dearman was having the diagnostic testing before he arrived at the Hospital. Dr. Christian said he did not oversee Dearman's diagnostic test and was not at the Hospital when the IV was placed in her arm. Dr. Christian also stated that he was not at the Hospital when the contrast was injected into Dearman's arm. According to Dr. Christian, either the attending physician or the emergency room physician would have overseen the injection of the contrast fluid.

¶24. Pursuant to *Winters, Partin*, and *Honeycutt*, we find that the trial court did not err by finding that Dr. Christian was not vicariously liable for the actions of the Hospital employees. The evidence clearly showed that the radiology staff was not under Dr. Christian's direction and control at the time of Dearman's procedure, pursuant to *Winters* and *Honeycutt*.[2]

¶25. In addition, there was ample evidence, as discussed more fully in Issue II, that Dr. Christian was not aware of Dearman's procedure and was not present at the Hospital at the

---

[2] Dearman also disputes the trial court's finding that the Hospital staff's administration of the contrast solution was a routine act which Dr. Christian could reasonably assume could be performed in his absence pursuant to *Honeycutt*, 986 F. 2d at 123. Without addressing this issue in great detail, the testimony revealed that Hill had on-the-job training for his job duties, many years of experience at the Hospital, and had performed hundreds of similar procedures without incident. Notwithstanding Dearman's opposition to the trial court's finding, the testimony revealed that Hospital procedure was followed for Dearman's injection. Many witnesses testified that in the absence of a radiologist, the Hospital procedure was to notify the emergency room or attending physician prior to injecting a patient with the contrast material. Here, Hill called the emergency room doctor prior to performing the injection. This physician, therefore, oversaw the procedure.

time of Dearman's procedure. No one testified to Dr. Christian's presence prior to the administration of the contrast fluid.

¶26. The facts of this case support a finding in accord with *Partin*. Here, Dr. Christian was not aware that Dearman was coming to the Hospital for her scan. At the time of her arrival, Dr. Christian was not present at the Hospital. The Hospital procedure was to have an emergency room or attending physician oversee the contrast injection in the absence of the radiologist. These procedures were followed, and Dr. Christian cannot be held vicariously liable for the actions of the Hospital employees when other Hospital physicians were left in charge of the testing procedures.

## II. Negligent Supervision.

¶27. Dearman argues that there is a substantial factual dispute concerning when Dr. Christian arrived at the Hospital on May 31, 2000. Dearman states that the reasonable inference from the facts is that Dr. Christian was present in the Hospital at the time of the CT scan.

¶28. Dearman claims that testimony from other individuals and Dr. Christian's own testimony as to his arrival time at the Hospital were in conflict. She asserts that the issue of whether Dr. Christian was present at the Hospital at the time of the injection of the contrast fluid is important because Dr. Christian testified that when he is present at the Hospital, he is responsible for the supervision of the radiology technicians and the injections.

¶29. Dearman argues that the deposition testimony of Bland indicated that Dr. Christian was at the Hospital at the time of the procedure. Dearman also argues that other testimony

13

placed Dr. Christian in the Hospital at the time of her procedure. More specifically, she contends that Hill's testimony and her own testimony contradict Dr. Christian's testimony about his arrival time. In addition, Dearman argues that Dr. Christian stated that he went with her to Dr. Thaggard's office at approximately 11:00 a.m., after at least two hours of monitoring Dearman's arm, indicating that he must have arrived prior to 9:00 a.m.

¶30. We find that the testimony shows no genuine issue of material fact in dispute. No testimony from any source placed Dr. Christian in the Hospital at the time of Dearman's CT scan. Dearman, Hill, and Threadgill stated that Dr. Christian came into the x-ray room after the procedure. Dr. Christian stated that he was not present in the Hospital when the procedure was performed. Bland stated that Dr. Christian normally arrived at the Hospital at 8:00 or 9:00 a.m. on Mondays, Wednesdays, and Fridays, yet he did not testify as to Dr. Christian's arrival time on May 31, 2000.

¶31. More specifically, Dearman stated that she arrived at the Hospital at approximately 8:00 a.m. She went to the emergency room and a nurse inserted a Hep-Lock into her arm and Benedryl for her allergies. Dearman then went to the radiology room. Her diagnostic scan indicated that the procedure was performed at approximately 8:54 a.m. The procedure was completed in a few minutes.

¶32. Threadgill stated that after Hill administered the contrast, Hill waited for the scan to complete, noticed that no contrast fluid was showing on the screen, and called him. Threadgill came back to the room and discussed the situation, however, Dr. Christian was not at the Hospital when the procedure was started. Threadgill did not know the exact arrival

14

time of Dr. Christian, but stated that he usually arrived at the Hospital between 9:00 and 9:45 a.m. Hill stated that Dr. Christian must have arrived "sometime shortly after 9." Even Dearman herself stated that the first time that she saw Dr. Dearman was after she was injected with the contrast solution.

¶33. Dr. Christian stated that he arrived at the Hospital at about 9:15 or 9:20 a.m. on May 31, 2000, and that he was unaware of Dearman's procedure. Upon his arrival, Dr. Christian saw Dearman "sitting on the fluoroscopy table, and Herbert Hill was standing in front of her." When questioned further, Dr. Christian stated that he arrived at the Hospital between 9:15 and 9:30 a.m. When he saw Dearman sitting up on the table, Dr. Christian stated that he went into the room and saw her swollen forearm. Dr. Christian stated that he was not called into the room, but walked into the room. He stated "I was coming down the hall and had either just turned into my office or was fixing to turn into my office. And I looked to my left, and the door was open into the fluoroscopy room. And that's when I saw Herb and Ms. Dearman on the other end of the x-ray table."

¶34. As stated previously, Dr. Christian did not know that Dearman was having the procedure, he did not order the tests and, he was not present at the Hospital at the time of the procedure. When questioned further about his knowledge of Dearman's procedure, Dr. Christian testified as follows:

> Q. Dr. Christian, before we took our break I'd asked you if you had known that Ms. Dearman was having the diagnostic testing done before you arrived at the hospital, and you said no. Is that correct?
> A. (Nods head affirmatively.)

15

Q. So you didn't know she was even going to be there that day?
A. Correct.
Q. You did not oversee the diagnostic testing for her, did you?
A. No.
Q. So you weren't even at the hospital when the IV was placed in her arm?
A. No.
Q. When the contrast was injected into her arm. Is that correct?
A. I was not there.
Q. Not there. Didn't know it was even going to be done?
A. No.
Q. Do you know who would have oversaw the injection of the contrast?
A. Either the attending physician or the emergency room physician, one of the two.

¶35. According to Hospital emergency room records, it appeared that Dearman had the catheter inserted at 8:30 a.m., and Benedryl was administered at 8:48 a.m. The CT scan from the radiology department indicated that the procedure was performed at 8:50 or 8:54 a.m. According to Dr. Christian, the test takes only three to four minutes to complete.

¶36. After examining Dearman's arm and applying warm soaks for at least two hours, Dearman and Dr. Christian walked to Dr. Thaggard's office located across the street from the hospital to have him look at Dearman's arm. When asked what time Dr. Christian walked with Dearman to Dr. Thaggard's office, Dr. Christian stated "I can give you a best estimate of mine that would be around 11:00. But I'm not a hundred percent sure. We watched her at least two hours."

¶37. Hill stated that after the study was performed he noticed that the contrast material was not where it should have been, in Dearman's kidneys and bladder. Therefore, he went to get Dr. Christian from his office and asked him to come into the x-ray room. Dearman stated

16

that when the technician stopped giving the injection, she sat up on the table. She did not know how long after the injections that Dr. Christian came to look at her arm. Clearly, neither Hill nor Dearman testified that Dr. Christian was at the Hospital at the time of the procedure. Hill specifically stated that the emergency room physician was overseeing the procedure that day, not Dr. Christian. Furthermore, neither Hill nor Dearman could testify to an exact time that Dr. Christian arrived at the Hospital. We find that, even though there was some conflict among Hill's, Dearman's, and Dr. Christian's testimony, there was no evidence that Dr. Christian was present at the time of Dearman's procedure. Neither Hill, Dearman, nor Threadgill saw Dr. Christian until sometime after the procedure was completed, after there was some indication of a problem with the test. Further, the fact that Hill stated that the emergency room physician was overseeing the procedure demonstrates that Dr. Christian was not at the Hospital at the time of the procedure.

¶38. We find that no additional analysis is needed concerning Dearman's assertion that Dr. Christian was at the Hospital prior to 9:00 a.m., based upon Dr. Christian's statement that he applied warm soaks to Dearman's arm for at least two hours and then walked over to Dr. Thaggard's office at about 11:00 a.m. As Dr. Christian stated, the time he went to Dr. Thaggard's office was his "best estimate" only. In addition, all of the testimony discussed above clearly shows that there was no testimony that placed Dr. Christian in the Hospital prior to Dearman's procedure.

**CONCLUSION**

17

¶39. For the foregoing reasons, we find that the Circuit Court of Attala County did not err by granting partial summary judgment to Dr. Christian on the issues of vicarious liability and negligent supervision. Therefore, the judgment of the Circuit Court of Attala County, Mississippi, is affirmed.

¶40. **AFFIRMED**.

**SMITH, C.J., WALLER AND DIAZ, P.JJ., CARLSON, DICKINSON, RANDOLPH AND LAMAR, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY.**