BURNHAM VAN SERVICE, INC., et al. *v.*
DEPENDENTS OF MOORE

No. 43050 June 1, 1964 164 So. 2d 733

*P. D. Greaves*, Gulfport, for appellants.

*Eaton, Cottrell, Galloway & Lang,* Gulfport, for appellees.

BRADY, TOM P., J.

This cause is appealed from the judgment of the Circuit Court of Harrison County, Mississippi, by Burnham Van Service, Inc. and St. Paul Mercury Insurance Company, which judgment affirmed an order of the Mississippi Workmen's Compensation Commission, which also was an affirmation of an order of the Attorney Referee. The order of the Attorney Referee held (1) that the relationship of employer and employee existed between Burnham Van Service, Inc., hereinafter desinated as Burnham, or appellant, and Lloyd Lavon Moore, deceased, at the time of the injury and death of Lloyd Lavon Moore, hereinafter called Moore; (2) that the parties were subject to the Mississippi Workmen's Compensation Act at the time of the injury; (3) the accident causing the injury and death arose out of the employment of Burnham; and (4) the decedent's average weekly wage was $75.

The claim arose out of the death of Moore, who was the driver of a truck which was leased to Burnham. While in the State of Ohio, Moore presumably was killed on October 9, 1960, at approximately 3:00 A. M., by a shot from a pistol he had purchased and had with him. There were no eye witnesses to the shooting to report whether such was accidental, self inflicted, or

by the act of some unknown person. The dependents of the deceased filed a claim for Workmen's Compensation benefits. Burnham denies the deceased was its employee, denies the parties were subject to the Mississippi Workmen's Compensation Act, denies that the deceased was performing service growing out of and in the course of his employment, denies that the accident causing the death arose out of the alleged employment, and denies specifically that Burnham was insured under the Mississippi Workmen's Compensation Act at the time of the injury. These denials were urged in the circuit court.

In the former hearings, and as in this appeal, the contention of the appellants is that the deceased was not an employee of Burnham and that, even if he had been, the Mississippi Workmen's Compensation Commission had no jurisdiction in the matter. From an adverse ruling by the Attorney Referee, which was affirmed by the Commission and then by the Circuit Court of Harrison County, this appeal by both appellants is perfected. The errors assigned by the appellant are as follows:

1. The circuit court erred in affirming the order of the Workmen's Compensation Commission dated March 19, 1963, as amended by the order of the Commission dated March 25, 1963, which affirmed the order of the Attorney Referee dated December 11, 1962, for the reason that (1) the order was contrary to the law in that it held (a) that the relationship of employer and employee existed, at the time of the injury and death, between Burnham and Moore, deceased; (b) that the parties were subject to the Mississippi Workmen's Compensation Act at the time of the injury; (c) that the accident causing the injury and death arose out of the employment with Burnham. It is apparent, therefore, that the assignment of error covers the same basic contentions which were made by the appellants in the hear-

ing before the Attorney Referee, the entire Workmen's Compensation Commission, and the Circuit Court of Harrison County.

The record in this case discloses the following facts: One Robert Howard Bates, who resides in Long Beach, Mississippi, was on and prior to October 9, 1960, engaged in the household furniture moving, and furniture business; that locally he performed his task of moving furniture and household goods on his own, but on an interstate basis he was forced to lease his moving equipment to Burnham, or to some other company duly authorized and permitted to engage in interstate commerce. Bates did not have any certificate or permit authorizing him to operate in his own name in interstate commerce. The record shows that Bates had two employees, one named Lloyd Lavon Moore, the deceased herein, and one named Frank Higginbotham. The record discloses that Bates had leased from one Dumas Milner the tractor truck and trailer involved. The record shows that in accordance with his practice, Bates had leased this truck for approximately two years and that during that period of time the deceased, Moore, had been working for him. The record shows that for approximately a year and a half Bates had leased this truck to the Red Ball Express; that upon terminating his operations with Red Ball Express he then leased the truck and signed the lease agreement with Burnham. The record further shows that during the first two months under this new contract with Burnham, the deceased, Moore, did not drive the truck because of an injury to his back and he was not able to do so, but that after recovering from his back injury he drove the truck for a period of about five months, until his death. The record shows that Bates fixed Moore's salary at $75 per week; that Burnham had nothing whatsoever to do with fixing the amount. The record shows that Bates and Moore were very close friends and that Bates had negotiated the

lease of the truck in order to give Moore employment. The record further shows that subsequent to deducting the $75 per week salary and after deducting the truck expenses of gas, oil, lubrication, and repairs, all of which Burnham advanced, and after paying Burnham its hauling charges, any balance left would be divided equally between Bates and Moore. The record shows that while Burnham could complain to Bates about any inefficiency of Moore's services and require Bates to furnish them a new driver, they could not discharge Moore from Bates' employment; that only Bates could discharge Moore as a driver or an operator of the truck, but Burnham could refuse to let Moore haul the property they were transporting. Bates, however, could discharge Moore at any time he desired. There was only an oral contract, an understanding, between friends. The truck was in Bates' name, and the lease agreement was entered into between Bates and Burnham. The record shows that Moore proceeded to operate the truck as its driver, after the lease agreement between Bates and Burnham had been consummated. Burnham had no authority to terminate, to increase or to decrease the salary which Bates had agreed to pay Moore. The record shows that at the time of his death the truck had been operating at a $500 per month loss so that there was no division of returns above expenses in the operation of the truck between Bates and Moore. The record shows that Bates deducted the social security and withholding tax from Moore's salary. The record shows that if Moore needed help in loading or unloading the truck, he had the authority to employ help and pay for the same from money which Burnham had advanced him, but that when the settlements were finally made, deductions were taken from the money earned so that it was against Bates that this advance was actually charged. Bates had to maintain the truck, pay for its repairs, pay for the oil, gas and incidentals necessary for its operation as pro-

vided for in the lease agreement. It appears that Burnham advanced the money to Moore but deducted any advances which had been spent by Moore in carrying out the terms and conditions of the contract before any settlement was made with Bates. The record shows that Bates paid the hospital bill incurred by Moore after his injury, and it was Bates who sent a driver to Belafonte, Ohio, where Moore was shot and killed, in order to get the truck, and return it to Gulfport. The record shows that Moore considered Gulfport his home, and between his trips he would always return to Gulfport. It appears that Moore would take his $75 weekly salary out of the money which had been advanced by Burnham to cover the expenses of the hauling trip. The record further shows that Moore had become dissatisfied with the Red Ball operation and it was because of his dissatisfaction that Bates contacted Burnham in Columbus, Georgia, and negotiated the lease with Burnham. It appears that the lease contract was sent to Bates in Gulfport, Mississippi and that he signed and executed the lease there, and that it was then returned to Burnham in Columbus, Georgia. It appears that Moore had moved from Jackson, Mississippi to Harrison County in order to be able to operate the truck, under Bates' lease contract, from Gulfport. The record shows further that the truck had been previously painted with the Red Ball insignia but that when it was leased to Burnham, the Burnham permit numbers were placed thereon with the Burnham name and the address at Columbus, Georgia. The record further shows that some of the drivers wore uniforms which consisted of pants and a shirt with the Burnham insignia thereon. The record further discloses that Burnham's dispatcher in Columbus, Georgia would notify the drivers of the various trucks which had been leased where to go and pick up the furniture and equipment (not freight), which was to be moved. Burnham instructed the drivers when

to load the furniture, or the goods to be moved, where to move the goods, and when to move it. They were also instructed what to charge for this moving. They were also required to telegraph the money which they had collected because of the moving of the household goods or wares. The record shows that Burnham had a safety director or inspector who checked the trucks and that this truck was inspected by an agent of Burnham when it was en route to Florida, in order to be sure that it was clean and free from insects. The record shows that Burnham paid for the licenses and the truck tags for the first truck leased. Thereafter the lessor was required to take care of the truck tags and license expenses.

The record shows that Burnham distributed certain safety material, mailed it out to the drivers and that they also were given requisite instruction with reference to the I. C. C. regulations and that the drivers also had to take physical examinations and comply generally with the I. C. C. regulations relating to hauling of goods, wares and merchandise in interstate commerce. It appears that the specific objective of these agents was that of safety; that they did not supervise or direct the operators in the details of the performance of their duties as truck drivers of the leased vehicles. It appears that the cost by correspondence, in ascertaining the traffic charges, was paid by Burnham and that a driver could call the dispatcher with reference thereto. If he called for necessary instructions from the dispatcher, then it is quite probable that the dispatcher would give the authorization and the appellant would pay the cost of the call, but if he called for an advance of money or for anything of a personal nature, then Moore or the driver calling would have to pay the cost thereof.

The record shows that around 3:00 o'clock in the morning, when the truck had stopped at a Truck Stop in Belafonte, Ohio, Moore was struck by a bullet fired from a pistol which was, according to police reports,

not more than three inches away from his shirt when the bullet struck him. It appears that Burnham furnished Moore with daily logs, which it required him to fill out, showing the route which he was taking and the mileage and the other basic requirements which would be customary in such an operation. The record discloses that Moore was never carried on Burnham's records as a regular employee; that Burnham has never paid directly any salary to Moore, but did furnish operating expenses from which Moore's weekly salary was taken; that Burnham has never deducted from any money advanced to Moore, or to Bates for Moore for expenses, any sums for social security or withholding taxes; that all taxes which should have been paid with reference to Bates' lease with Burnham were all charged back to Bates and that this is true of any cash advances which were made by Burnham for any work, or for any purpose under the lease; they were deducted and charged back to Bates. The record shows that Burnham has approximately one hundred and thirty-eight payroll employees; that under the leasing arrangements, Burnham has approximately three hundred truck operators who are driving owned or leased trucks, and driving for persons who in turn have leased the trucks to Burnham. We have set forth the facts in considerable detail in order that an accurate analysis of the various relationships can be made.

The assignments of error also set forth the basic questions for consideration by this Court. The first error assigned is simply (a) that the circuit court erred in affirming the order of the Workmen's Compensation Commission dated March 19, 1963, as amended by order of the Commission dated March 25, 1963, affirming the order of the Attorney Referee dated November 11, 1962, for the reason that it was contrary to the law in that it held that the relationship of employer and employee existed at the time of the injury and death,

between Burnham and Moore; (b) that the parties were subject to the Mississippi Workmen's Compensation Act at the time of the injury; and (c) that the accident causing the injury and death arose out of the employment of Burnham. We face, therefore, this basic question of whether or not Moore was an employee of Burnham, or whether he was an employee of Robert Bates. Involved in this question also is the additional question of whether or not the deceased, Moore, and Bates were independent contractors. Appellant and appellee both agree that the criterion used and cited in Clark v. Luther McGill, Inc., 240 Miss. 509, 127 So. 2d 858, correctly expresses the controlling elements which determine whether or not the employer and employee relationship exists. In that case we said:

"* * * The right to control the employee has been one of the dominant factors in all the cases, but the ultimate right to control should not be confused with immediate control, for it is the reserved right of control rather than its actual exercise that furnishes the true test of relationship; and he is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate results and in all its details, and the facts that the borrower gives information and directions to the servant as to the details of the work or the manner of doing it does not make the general servant of the employer the servant of the borrower."

While the briefs are prolix, the fact nevertheless remains that the questions presented here are, for the most part, comparatively simple, and the first question is in truth a question of fact. A general resume has already been given relating to the relationship between appellant and Moore with reference to each other and to Bates. We point out, however, certain significant and very certain facts with reference to the question of whether or not Moore was an employee of the appellant.

1. It is to be noted that the operation which Moore was engaged in could only have been engaged in because of the certificate or permit which appellant had and under which Moore was employed to drive the truck in question. Bates' operation of a truck and the driving thereof by Moore was purely intrastate. The employment which Moore sought and which Moore received was the interstate employment which was afforded by the leasing of the truck by Bates and by the operation of the permit or certificate held by Burnham, the appellant.

2. While it is true that Moore and Bates arbitrarily agreed on the sum of $75 per week salary for Moore, nevertheless, this sum of money and all other sums of money were advanced by the appellant in order that Moore might obtain his $75 per week salary and also have cash in order to purchase oil, gas, lubrication, and pay for repairs in the operation of the truck.

3. While it is true that Burnham could not have discharged Moore insofar as operating a truck for Bates within the state of Mississippi is concerned, nevertheless, Burnham could have required Bates to give another driver instead of Moore and therefore the appellant could prevent Moore from transporting any goods or merchandise which the appellant had obligated to transport. This is tantamount to being able to discharge Moore insofar as carrying out the work of appellant is concerned.

4. There was no formal contract which existed between Moore and Bates. It was a mutual agreement or understanding between friends and the record fails to disclose that Bates paid Moore anything except that which was obtained from the operations with Burnham. The record shows that any sums which were necessary to be spent in order to unload the truck which Moore was driving for the appellant were furnished by the appellant, the final settlements being taken out of any earnings which ultimately would have come to Bates.

The appellant advanced all the monies which were necessary in order that Moore might successfully carry out the transportation assignment.

5. The truck was stored in Gulfport when not being operated. Gulfport was the home of Moore. Gulfport is the site where Moore signed the contract and the contract apparently became operative when signed by Moore in Mississippi, since it does not appear on the face of the contract that the appellant ever signed the contract. If so, the contract was signed by Bates on the 15th day of March, 1960, and the contract went into operation on said date, which was the date upon which Robert H. Bates signed the contract in Gulfport, Mississippi.

6. After every trip Moore would return to Gulfport where he would spend the time between trips with his family and in his home. Gulfport, Mississippi was considered his base of operations by the appellant.

7. The record shows that the appellant paid for all telephone calls which were properly made with reference to carrying out the orders of the appellant. All expenses of mailing, all telegrams and matters of this nature were paid by the appellant.

8. The record shows that Burnham purchased the tag and permits for the truck which Moore was driving; that the Burnham permit numbers were placed on the side of the truck, with the Burnham name, and with the address of Burnham as Columbus, Georgia.

9. The record shows that Moore himself wore a uniform which had on the shirt thereof the Burnham insignia.

10. The record shows conclusively that Moore received his orders from the appellant; that the appellant notified Moore and all the other drivers similarly employed where to go, and what furniture, goods or equipment (not freight) was to be moved. The record discloses that Moore was told when to load this equipment, where this equipment was to be moved and when he was to

move it and when it was to be unloaded. Furthermore, the appellant instructed Moore as to what charges should be made for the moving and that Moore was required to telegraph the monies which had been collected because of the moving to the appellant.

12. The record further shows that the appellant had a safety director or inspector who was over Moore and who had the authority to check and inspect the truck which he was driving and to see that it was in safe condition and was complying with all of the Interstate Commerce Commission's ruling. The record shows that when en route to Florida, this particular truck driven by Moore was inspected to be sure that it was clean and free from insects or fruit diseases.

13. The record shows that Burnham distributed certain safety material which was mailed to the drivers.

14. The record also shows that Burnham gave the drivers requisite instructions with reference to the Interstate Commerce Commission's regulations insofar as their driving was concerned.

15. That Moore was required to undergo a physical examination by the appellant. The record discloses that these inspectors or safety agents lectured or talked with Moore and with the other drivers of the leased vehicles, advising them and cautioning them with reference to the operation of the trucks and the safe maintenance and operation thereof. If there was any deviation from the expected, then it was Moore's duty to call the appellant for the necessary instructions and obtain from the dispatcher the permission and consent to do that which appeared to be necessary because of the happening of these unanticipated events. While it is true that Bates deducted for Moore's social security and withholding taxes, still this does not indicate that Moore considered himself an employee of Bates. The records indicates that Moore generally considered himself an employee of the appellant.

16. The record further shows that the appellant required Moore to keep accurate, and turn over to it periodically, daily and trip logs relating to the particular trip which Moore was carrying out at the appellant's instance.

17. The record shows that Moore could not do any independent hauling whatsoever; that all transportation or hauling which he did was at the express orders of the appellant. The record shows that the appellant was obtained because Moore wanted it rather than the Red Ball Express for which Moore had previously worked.

The final question is, therefore, who had the ultimate control over Moore? Was it Bates or was it Burnham, the appellant? From the foregoing it is obvious that it was the appellant Burnham who had the final and absolute control over the deceased, Moore. As a matter of fact, page 19 of the record, Section 22 of the contract which Bates executed with the appellant, states as follows:

"Drivers operating motor equipment covered under this agreement, whether furnished by Contractor, or otherwise, shall be controlled and directed by the Corporation, and shall prepare and turn over to the Corporation drivers logs according to the law. Further, said drivers shall comply with physical examination requirements according to law, and comply with all applicable laws."

It is obvious from the record that Bates exercised little or practically no control over Moore whatsoever; that it was the appellant Burnham who did exercise all the control necessary to see that its objectives were carried out in detail. It appears, therefore, from a careful study of this record, that the Commission, as well as the Attorney Referee, was amply warranted in finding as it did. It follows, therefore, that the circuit court, insofar as the employer-employee relationship between appellant and Moore is concerned was likewise

justified in so finding. There can be no doubt that Burnham was a special employer of Moore; that the appellant was the lessee of the truck and the driver and as such is liable as an employer. See Rainbow Poultry Co. v. Ritter Rental System, Inc., 140 So. 2d 101 (Fla. 1962); Jackson Trucking Co., Inc. v. Interstate Motor Freight System, 122 Ind. App. 546, 104 N. E. 2d 575 (1952). See also volume 1 of Larson's Workmen's Compensation Law, Sec. 48.23, also Secs. 48.30 and 48.40.

The second point relating to the contention of the appellant that the finding of the lower court and the Compensation Commission was contrary to law is to the effect that the parties were not subject to the Mississippi Workmen's Compensation Act at the time of the injury. Again, we feel that the Attorney Referee, the Commission and the circuit court were justified in holding that the Mississippi Workmen's Compensation Law was operative and binding upon the appellant and the deceased, Moore, at the time of the injury and death. Moore's employment was initiated from and in Gulfport. It was there that the contract was signed, and that is the only signature which appears upon the contract insofar as the place of execution is concerned. This is true although it was accepted by Burnham in Georgia, where the contract was mailed by Bates to Columbus, Georgia, after he had executed it. At all times Moore's base of operation was in Gulfport. He was a resident citizen of Gulfport, to which city he had moved from Jackson, Mississippi. It was to Gulfport that he returned after each trip and it was in Gulfport that he remained until directed by Burnham's dispatcher to go on another trip, transporting goods and equipment. The truck remained, the record discloses, in Gulfport for indefinite periods of time and it came to rest in Gulfport rather than in any other place. This was with the express consent and approval of Burnham, whose dispatchers controlled Moore's movements and who called Moore

at his home in Gulfport in order to give him each new assignment. The record discloses that he had been on the fatal trip for only about a week and that his departure from this state was not caused by any permanent assignment or transfer. It was merely another trip to be completed in accordance with the instructions of the appellant. He was, therefore, temporarily absent from the state only for the period of time it would take him to transport the goods to the destination from the place they were to be picked up. He would then return to the state. This is contemplated by Sec. 49 of the Mississippi Workmen's Compensation Act, which is as follows;

"Extra-territorial application.—(a) If an employee who has been hired or is regularly employed in this state receives personal injury by accident arising out of and in the course of his employment while temporarily employed outside of this state, he or his dependents in case of his death shall be entitled to compensation according to the law of this state. This provision shall apply only to those injuries received by the employee within six months after leaving this state, unless prior to the expiration of such six months' period the employer has filed with the commission of Mississippi notice that he has elected to extend such coverage a greater period of time.

"(b) The provisions of this section shall not apply to an employee whose departure from this state is caused by a permanent assignment or transfer.

"(c) Any employee who has been hired or is regularly employed outside of this state and his employer shall be exempted from the provisions of this act while such employee is temporarily within this state doing work for his employer if such employer has furnished workmen's compensation insurance coverage under the workmen's compensation or similar laws for a state other than this state, so as to cover such employee's

employment while in this state, provided the extra-territorial provisions of this act are recognized in such other state and provided employers and employees who are covered in this state are likewise exempted from the application of the workmen's compensation or similar laws of such other state. The benefits under the workmen's compensation act or similar laws of such other state shall be the exclusive remedy against such employer for any injury, whether resulting in death or not, received by such employee while working for such employer in this state'' Sec. 6998-55 Miss. Code 1942, Anno.

Furthermore, in 2 Larson, Sec. 87 and the following sections, these particular problems are discussed and it is pointed out that sufficient grounds for applying the local statutes include the place of injury, the place of contract, the employee's residence, localization of employer's business. Sec. 87.2 discusses some of these factors. The existence of the employer-employee relationship within the state gives this state an interest in controlling the instance of that relation. In the case of Mandle v. Kelly, 229 Miss. 327, 90 So. 2d 645, this Court held:

''* * * Humanity also demands that indigent and helpless persons be furnished the necessities of life, and this, too, must be furnished by the State through Public or private means. The duties of the State rest more on moral rather than legal grounds, but the power of the State, to legislate in regard thereto rests on firm legal ground. This State has done so by assuring the payment of compensation so that an injured employee who is covered by the act may not become a public charge; and by making provisions that whoever may succor the injured employee by providing hospital and medical care shall be paid therefor. These considerations are public ones; they are substantial; and they are the

legitimate concern of the State where the injury occurs. * * *''

In the Mandle v. Kelly case, we were dealing with a stranger who was not a Mississippian, who was not domiciled in Mississippi, whose contract had not been entered into in Mississippi, but we were dealing with a stranger who happened to have been injured in Mississippi, and if we could, in the stranger's case, permit the Mississippi compensation law to operate, how much more can we in the case of a native Mississippian permit the same act to operate in the interest of humanity to give aid to this helpless Mississippian. We cannot agree that Mississippi has no more than a scant interest in this contract of employment and has no legitimate interest in the subject matter which can operate legally. Furthermore, we disagree thoroughly with the contention of the appellant that ''in a sense Moore was nothing more, in this instance, than a part of the truck belonging to Bates.''

The case of Index Drilling Co. v. Williams, 242 Miss. 775, 137 So. 2d 525, urged by the appellant to be on all fours in this with the case at bar, is clearly distinguishable for this one simple reason, that this record indicates that Moore considered the appellant his employer, and so did Bates consider the appellant Moore's employer. On page 16 of the record we find this:

''You (Bates) didn't yourself consider him (Moore) as an employee?

''A. No, sir, he was a friend of mine and I was trying to help him out.''

The overwhelming evidence conclusively shows that Moore realized all of his instructions, all of his duties, all of his responsibilities, all of his privileges, came from the appellant, who was his employer. It is not essential that the accident happened in Mississippi in order to allow the Mississippi Workmen's Compensation Act to operate. There are countless numbers of persons who

are employed by Mississippians in Mississippi and by persons from other states who operate trucks within and without the state of Mississippi, and who are absent from the state of Mississippi for a considerable period of time, but who ultimately return to the state of Mississippi, bringing the trucks with them to their homes and who consider themselves Mississippians and who are considered by their employers as being Mississippians and therefore within the purview of the Mississippi Workmen's Compensation Act.

Considering the assertion that Moore was an independent contractor, either alone or in concert with Bates, we fail to find any of the generally accepted criteria which this Court has repeatedly said must be present in order to affirmatively show the existence of the independent contractual relationship. Hercules Power Co. v. Westmoreland, 164 So. 2d 471, rendered by this Court on May 25, 1964, not yet reported, and cases cited therein. Kisner v. Jackson, 159 Miss. 424, 132 So. 90; Crosby Lbr. & Mfg. Co. v. Durham, 181 Miss. 559, 179 So. 285-287, 854; Carr v. Crabtree, 212 Miss. 656, 55 So. 2d 408. In addition thereto, in 1 Larson Workmen's Compensation Law, Sec. 44.34, Note 68, citing many cases thereunder, we find this statement:

"* * * There is a growing tendency to classify owner-drivers as employees when they perform continuous service which is an integral part of the employer's business."

If Moore did not perform his duties, there would be no business in which the appellant could be engaged and therefore Moore's duties and service did constitute an integral part of the appellant's business.

In Dunn's Mississippi Workmen's Compensation, Sec. 73 of the 1963 cumulative supplement, it is also pointed out that where the work performed carries out an integral part of the employer's business, as it does in the case at bar, the relationship is one of employment

rather than of independent contractor. Then, too, the degree of control exercised by the appellant here clearly shows that Moore was not an independent contractor. Kughn v. Rex Drilling Co., 217 Miss. 434, 64 So. 2d 582; Wade v. Traxler Gravel Co., 232 Miss. 592, 100 So. 2d 103 (1958).

In conclusion, there can be no doubt that the accident causing the injury and death grows out of the employment of the appellant and that the deceased's average weekly wage, which is uncontested, amounted to $75 per week.

For the foregoing reasons and for the additional reason that we have repeatedly held that the Commission is a trier of facts and that its findings will not be reversed if there is substantial evidence in support thereof, we cite Lee v. Haltom Lumber Co., 230 Miss. 655, 93 So. 2d 641.

Therefore, the orders of the Mississippi Workmen's Compensation Commission and of the Attorney Referee allowing compensation are hereby affirmed.

Affirmed.

*Lee, C. J., and Ethridge, Gillespie and McElroy, JJ.,* concur.