GILLESPIE, Presiding Justice.
This is an appeal by the plaintiff from an adverse judgment in a suit for contractual indemnity. The suit was filed in the Circuit Court of Hinds County and was tried before the judge without a jury. . We hold that the judgment of the trial court was correct and is, therefore, affirmed.
C. H. Leavell & Company and Peter Kiewit Sons’ Company (hereinafter Prime Contractor) as joint venturers entered into a contract with the United States Government for the construction of certain facilities at the NASA Test Facility in Mississippi for a consideration of thirteen million dollars. On December 16, 1963, Prime Contractor entered into a subcontract with J. V. Doster, doing business as Central Gulf Construction Company (hereinafter Doster), for that portion of the prime contract involving the excavation of 1,928,100 cubic yards of dirt for a consideration of in excess of one million dollars. The subcontract required Doster to perform the excavation in accordance with the contract, to enforce certain safety rules, to carry workmen’s compensation and public liability insurance, and to indemnify Prime Contractor from liability resulting from Dos-ter’s negligence. The contract also provided that Doster would secure a performance and payment bond on a form furnished by Prime Contractor within three days after the execution of the subcontract “and in any event prior to the start of operations at the project site.” Since Doster had not furnished the bond, a supplemental agreement was entered into December 31, 1963, between Prime Contractor, Doster and GO-MAC, the latter being a firm engaged in the rental of the heavy dirt-moving equipment necessary for the performance of the subcontract. This agreement provided that in the event Doster remained unable to furnish the performance bond by January IS, 1964, the Prime Contractor,
“* * * shall have the right to take over the subcontract and the performance thereof on the following terms and conditions:
1. GOMAC agrees to make initial shipment of equipment required for performance of the subcontract, as specified therein, on January 6, 1964, to complete the shipment of all such equipment by January 31, 1964, and to leave the equipment on the job until completion of the subcontract work, or until released by CONTRACTOR. As rental for the use of such equipment, CONTRACTOR will pay to GOMAC monthly the sum of 11^ per cubic yard of material removed during the preceding month, as shown by the certified Corps of Engineers payment estimate for such preceding month.
2. A separate set of books and accounts will be kept for the subcontract work, and the subcontract will be charged only with the direct costs (including the equipment rentals as here- *777 inabove provided) required for its performance in accordance with the terms and conditions thereof.
3. After payment of the direct costs, as provided above, and upon completion and final acceptance of the subcontract work by the OWNER, any funds remaining under the subcontract will be paid and applied as follows and in the following order:
(a) First, if subcontract funds are still available, GOMAC will receive an additional payment up to, but not exceeding, 7‡ per cubic yard of material.
(b) Second, if subcontract funds are still available, LEAVELL-KIEWIT will receive 2‡ per cubic yard of material for management services.
(c) Lastly, if further funds are available, the balance thereof will be paid to DOSTER.
In each case, the cubic yards of material will be as shown on certified Corps of Engineers payment estimates.
However, if, upon completion and final acceptance of the subcontract work by the OWNER, the total direct costs (including the equipment rentals, at 11‡ per cubic yard) exceed the total subcontract price, then DOSTER, his heirs, personal representatives, or authorized assigns, shall be liable to CONTRACTOR for the amount of such excess.
4. CONTRACTOR shall have full and complete authority and discretion in the performance of the work and the utilization of labor and materials, and CONTRACTOR’S good faith judgment as to the proper conduct of the work, cost of materials, labor, transportation, equipment expense, rentals thereon, supplies, services, insurance, taxes, appliances, tools, utilities, power, and other direct costs will be final and conclusive.
Doster never furnished the performance bond. However, he did furnish workmen’s compensation and public liability insurance for which Prime Contractor paid. Prime Contractor placed Doster on its payroll at $200 per week; Doster actually received $1,500 for services rendered in connection with the performance of the subcontract. Prime Contractor set up a separate set of books for the work pursuant to the subcontract, furnished all of the money for the payroll of the employees performing the subcontract, paid the rental to GOMAC, paid the premiums on the workmen’s compensation and public liability insurance coverage for the subcontract work, and all other costs in connection with the subcontract work. Prime Contractor directed all of the subcontract work including when and where the work was to be done, the amount to be paid the employees involved in performing the subcontract, and the authorization of purchases and the amount thereof. Engaged in other work in Texas, Doster visited the Mississippi Test Facility at times through September 1964. During 1964 when about seventy percent of the subcontract was performed Doster had several of his employees on the job, including the project manager, who were paid by Prime Contractor. Early in 1965 Prime Contractor terminated the subcontract entirely. The proof revealed that the subcontract work in its final result and in all its detail was totally and completely under the control of Prime Contractor and that Doster, a subcontractor in name only, was actually an employee of Prime Contractor receiving a weekly salary of $200. The proof shows overwhelmingly and without substantial dispute that when Doster could not make the performance bond Prime Contractor took charge of Doster’s employees, furnished the entire capital for performing the subcontract and maintained complete control over the whole operation pursuant to paragraph four of the supplemental agreement of December 13, 1963.
The basis of the present suit is that one Crisco was killed on September 4, 1964, when struck by a vehicle engaged in the performance of the subcontract work at an unlighted intersection on the job site. At the time of the accident Crisco was not *778 wearing reflectorized clothing as required in the prime contract. Crisco’s heirs sued Prime Contractor alleging a breach on the part of Prime Contractor of its non-delegable duty to enforce safety rules and regulations as to its subcontractor, Doster. After the intervention of the workmen’s compensation carrier who paid benefits to the widow of Crisco, the suit against Prime Contractor was settled for approximately $19,000.
Prime Contractor then filed the suit which is now before the Court against Doster for contractual indemnity. It is contended that the active negligence of Doster and his employees was the proximate cause of Crisco’s death, that Prime Contractor was liable to Crisco’s heirs under the wrongful death statute because of the non-delegable duty of Prime Contractor to enforce certain safety rules and regulations in the performance of the subcontract by Doster, and that it was the active negligence of Doster while only the passive negligence of Prime Contractor that caused Crisco’s . death. Indemnity was sought under the express terms of the subcontract or on the theory of implied agreement of Doster to indemnify Prime Contractor. The trial judge denied recovery.
In our view of the case the question is: whose employee was Crisco ? This question is resolved by determining whether Doster was an independent subcontractor. The trial judge stated in his written opinion that
* * * the general contractor [Prime Contractor] was in complete charge of all bills, determined when the men could work, what purchases they could make, whether they could or could not work at night, and innumerable other conditions incident to exclusive management not necessary to mention.”
Although the trial court did not specifically state that Crisco was Prime Contractor’s employee, the facts which he did find are equivalent to a specific finding that Crisco was in actuality an employee of Prime Contractor. In our opinion there is no substantial dispute in the evidence on this issue since the evidence conclusively shows that Prime Contractor took over the subcontract work, made use of Doster as an employee, and controlled Doster’s business organization at the job site. Thus, Prime Contractor performed the work that the subcontract originally required of Doster. All this was done by Prime Contractor as a matter of right under paragraph four of the supplemental agreement dated December 31, 1963. Unless Doster was an independent subcontractor in fact as well as in name, then Prime Contractor is not entitled to be indemnified by Doster for two reasons: (1) Crisco was an employee of Prime Contractor and his rights were limited to benefits under the workmen’s compensation act, Mississippi Code 1942 Annotated, Section 6998-05 (1952) and (2) all the negligence proximately causing the death of Crisco is attributable to Prime Contractor.
All of the workmen engaged in performing the subcontract were paid with Prime Contractor’s money. After Doster could not make the performance bond Prime Contractor had “full and complete authority and discretion in the performance of the work and the utilization of labor and materials,” and had “final and conclusive judgment as to the proper conduct of the work, cost of materials, labor transportation, equipment expense, rentals thereon, supplies, services, insurance, taxes, appliances, tools, utilities, power and other direct costs.” In view of these contractual rights and the undisputed fact that these rights were in fact exercised by Prime Contractor, it cannot be successfully argued that Crisco was other than an employee of Prime Contractor. Burnham Van Service, Inc. v. Dependents of Moore, 250 Miss. 165, 164 So.2d 733 (1964); Clark v. Luther McGill, Inc., 240 Miss. 509, 127 So.2d 858 (1961); Havens v. Natchez Times Publishing Co., 238 Miss. 121, 117 So.2d 706 (1960); Texas Co. v. Mills, 171 Miss. 231, 156 So. 866 (1934).
*779 The trial judge reached the correct result and his judgment is affirmed.
Affirmed.
RODGERS, JONES, BRADY and IN-ZER, JJ., concur.