LUTHER McGILL, INCORPORATED *v.* CLARK

No. 42377          November 5, 1962          146 So. 2d 338

*Beard, Pack, Ratcliff & Dillard,* Laurel, for appellant.

*Jones & Jones,* Waynesboro; *W. S. Murphy,* Lucedale, for appellee.

KYLE, J.

This case is before us on appeal by Luther McGill, Incorporated, defendant in the court below, from a judgment of the Circuit Court of George County rendered in favor of the appellee Archie B. Clark, plaintiff in the court below, against the appellant for damages for personal injuries alleged to have been sustained by the appellee while assisting in the unloading of parts of an oil drilling rig. This is the second time that the case has been before us on appeal.

The plaintiff alleged in his declaration that on or about May 29, 1958, he was employed by C. A. Hurst Drilling Company on an oil drilling rig in George County; that the drilling company had to move its rig to another location and the defendant Luther McGill, Inc.,

was moving the rig for the drilling company; that when McGill's superintendent and crew took charge of the moving of the rig the plaintiff and other employees of Hurst were put under the orders of McGill and remained so until the rig had been completely moved and relocated by McGill. Plaintiff further alleged that on the date mentioned above one of the defendant's trucks moved to the drilling site a section of the substructure of the drilling rig, weighing approximately 14½ tons, and another of the defendant's trucks known as the gin pole truck picked up the section of the substructure with a gin pole to set the structure in place; that when the substructure was lifted it was off balance and the plaintiff was ordered to sit on the upper end of the substructure to make it balance by his weight, and almost immediately after he sat down on the upper end of the substructure the chain, which was much too light for its load and known to be so by the superintendent of the defendant's crew, snapped in two and dropped the substructure on a boarded road. The plaintiff charged that he was dropped about 4½ or 5 feet, as a result of which a piece of line pipe which was being hauled in the section of the substructure caught his right hand, crushing the end of his fingers and breaking his pelvic bone and his backbone in several places, seriously injuring his testicles, and knocking the plaintiff unconscious.

The plaintiff charged that the defendant was guilty of negligence: (1) In that it did not have on its truck the proper equipment with which to lift, haul and relocate the substructure; (2) in that the chain used as a bridle to balance the substructure was utterly unfit for that purpose; (3) in that the superintendent of the defendant's crew was grossly negligent in ordering the plaintiff to sit where he was ordered to sit; and (4) in that the defendant failed to furnish the plaintiff a

safe place to work and safe equipment with which to work.

The plaintiff further alleged that, as a result of his injuries, he was totally disabled for work for approximately eight months, and that he was still unable at the time of the filing of his declaration to do his usual work in the oil and drilling business or to hold any job requiring real physical strength. The plaintiff charged that he was entitled to recover both actual and punitive damages.

The defendant in its answer denied that it was guilty of the several acts of negligence alleged in the plaintiff's declaration. As a second defense, the defendant denied that the defendant was in charge of operations at the drilling site, as alleged in the plaintiff's declaration. The defendant admitted that it was engaged in the trucking business and in moving oil field equipment, and that, at the time of the accident complained of its trucks and drivers were engaged in transporting an oil drilling rig substructure for Hurst from one drilling site to another. But the defendant averred that at the time of the accident the trucks and equipment owned by the defendant and used in moving the oil drilling rig for Hurst were leased or rented to Hurst, and that the employees of the defendant who were engaged in the moving of the rig were the loaned servants of Hurst, who had sole control of the operations at the drilling site, and the defendant, therefore, owed no duty to the plaintiff. The defendant also set up in its answer certain other special defenses, including in the alternative, as a fifth defense, the charge that the plaintiff at the time of his injury was the loaned servant of the defendant and therefore the relation of master and servant existed between the defendant and the plaintiff, and under the exclusive remedy provisions of the Mississippi Workmen's Compensation Law the defendant was immune to the suit at common law brought by the plaintiff.

The case was tried at the February 1960 term of the court, and at the conclusion of the evidence offered on behalf of the plaintiff, the court sustained the defendant's motion for a directed verdict on the ground that the plaintiff was precluded under the Mississippi Workmen's Compensation Law from maintaining a common law action against the defendant; and a judgment was entered in favor of the defendant. From that judgment the plaintiff prosecuted an appeal to this Court; and this Court, on March 13, 1961, reversed the judgment of the lower court and remanded the cause for a new trial. See Archie B. Clark v. Luther McGill, Inc., (1961), 240 Miss. 509, 127 So. 2d 858.

The case was tried again at the August 1961 term of the court, and the jury returned a verdict for the plaintiff for the sum of $25,000. The defendant's motion for a new trial was overruled, and a judgment was entered in favor of the plaintiff for the amount stated in the verdict of the jury. From that judgment the appellant has prosecuted this appeal.

The appellant has assigned and argued three points as grounds for reversal of the judgment of the lower court, to-wit: (1) That the verdict of the jury was so excessive as to evince bias, passion and prejudice on the part of the jury, and the court, therefore, erred in failing to sustain the appellant's motion for a new trial; (2) that the court erred in refusing to grant the appellant's request for a peremptory instruction and direct a verdict for the defendant at the conclusion of all of the testimony; and (3) that the verdict of the jury and the judgment of the court were contrary to the overwhelming weight of the evidence, and the court erred in failing to grant the defendant a new trial for that reason.

It was the primary contention of the appellant on the first trial that the plaintiff Clark, at the time of his injury, was the loaned servant and employee of the defendant McGill; that the relation which existed be-

tween the defendant and the plaintiff was that of master and servant; and that under the provisions of the Mississippi Workmen's Compensation Act the plaintiff's exclusive remedy was under the provisions of that Act. That contention was rejected by this Court on the first appeal, and in its opinion on that appeal the Court stated that the plaintiff's evidence on the first trial was sufficient to support a finding that the plaintiff was not an employee of McGill.

It was the primary contention of the appellant on the second trial that at the time of the accident which resulted in the plaintiff's injury the trucks and equipment of McGill were leased or rented to C. A. Hurst Drilling Company; that the employees of McGill who were engaged in moving the drilling rig to its new location were loaned servants of Hurst, who had sole control and direction of the operations at the drilling site, including the unloading and placing of the substructure at the new location; and for that reason McGill was not liable in a third party action for the injuries alleged to have been sustained by the appellee. The appellant's theory of the case on the second trial was presented to the jury in two instructions granted to the appellant in which the jury was told: (1) That if they believed from the evidence in the case that the employees of McGill, who were present and participating in the moving of the substructure at the time the plaintiff was injured, and the vehicles, machines and equipment of McGill which were being used in the moving of the substructure, were rented by the hour to C. A. Hurst Drilling Company by McGill and were under the exclusive control of Hurst, it was the sworn duty of the jury to find for the defendant; and (2) that if they believed from the evidence that it was Hurst which had the direction and control of the job of work being done at the time and place of the plaintiff's fall, it was their duty to find in favor of the defendant. The

jury by their verdict rejected the appellant's contention that the employees of McGill were the loaned servants of Hurst, and that McGill had no control over the personnel and no responsibility under the law for any acts on the part of his employees while engaged in unloading and placing of the substructure at the new drilling site.

After a careful examination of the testimony offered on behalf of the respective parties, we think there was no error in the refusal of the trial judge to grant the appellant's request for a directed verdict at the conclusion of all of the testimony. We also think that it cannot be said that the verdict of the jury and the judgment of the court were contrary to the overwhelming weight of the evidence, or that the court erred in refusing to grant the defendant a new trial for that reason.

The rule is well established by the decisions of this Court that in determining the question whether or not the defendant is entitled to a directed verdict, the evidence must be treated as proving every fact favorable to the plaintiff's case which is established either directly or by reasonable inference. Dean v. Brannon, 139 Miss. 312, 104 So. 173, 175; Bankston v. Dumont, 205 Miss. 272, 38 So. 2d 721; Kurn v. Fondren, 189 Miss. 739, 198 So. 727; Stricklin v. Harvey, 181 Miss. 606, 179 So. 345; Johnston v. Canton Flying Services, 209 Miss. 226, 46 So. 2d 533; Grice v. Central Electric Power Ass'n., 230 Miss. 437, 92 So. 2d 837, 96 So. 2d 909; Green v. Gulf, Mobile & Ohio Railroad Co. (Miss. 1962), 141 So. 2d 216.

The evidence offered on behalf of the plaintiff during the second trial was substantially the same as the evidence offered on behalf of the plaintiff during the first trial. The evidence relating to Clark's injury offered on behalf of the plaintiff may be summarized as follows: Clark was the general employee of Hurst. His

job was that of roughneck. Clark had helped McGill's truck driver tie the first substructure and move it in place. Clark then walked over to a nearby place and talked to J. P. Murray, Hurst's driller and Clark's superior, while McGill's swamper, who was McGill's truck driver's helper, "bridled" the second substructure by attaching the cable and chain thereto so that McGill's gin-pole truck could hoist the second substructure into place. McGill's swamper improperly bridled the second substructure by rigging it so that the chain used to bridle the substructure bore the weight of the substructure instead of merely guiding or balancing it. McGill's truck driver told Clark to get on one end of the substructure in order to balance it. Clark did so and sat down on the lower beam of the substructure, and when McGill's truck driver raised the substructure four or five feet off the ground the chain broke and the substructure fell with Clark on it.

There is practically no dispute as to the facts concerning the fall of the substructure and the plaintiff's injury; and whether the fall of the substructure was due to the improper bridling of the substructure, as testified by the plaintiff's witnesses, or the slipping of the chain used to bridle the substructure, as testified by McGill's truck driver, the proof clearly shows that McGill's truck driver and swamper were negligent in the harnessing and bridling of the substructure.

As to the appellant's claim that McGill's truck driver and swamper were loaned servants of Hurst and that McGill had no control over their acts while they were engaged in the unloading of the substructure at the new drilling site, the record shows without dispute that McGill was a public hauler whose sole business was that of hauling oil field machinery, supplies and equipment; and in order to do that McGill had a permit from the Interstate Commerce Commission and a permit from the Mississippi Public Service Commission;

that McGill owned trucks which were specially equipped for the loading, hauling and unloading of heavy oil rig machinery; that McGill had on his payroll truck drivers and swampers experienced in loading, hauling, unloading and setting in place such heavy oil rig machinery; that McGill paid the salaries of the truck drivers and swampers, and made deductions therefrom for income taxes and social security; and that McGill carried Workmen's Compensation insurance to cover his employees under the Mississippi Workmen's Compensation Law. The record also shows without dispute that McGill owned the gin pole truck and the cable and chain which were being used in the unloading and placing of the drilling rig machinery involved in this case; and that McGill's truck driver and swamper were in charge of the unloading operation. Both employees at the time of the plaintiff's injury were doing the work of McGill for which McGill was to receive compensation at the rates prepared by the Oil Field Haulers' Association and approved by the Interstate Commerce Commission.

According to the testimony of McGill's dispatcher, L. H. Rooney, and the account rendered by McGill to Hurst which was offered in evidence as an exhibit to Rooney's testimony, McGill moved 265,000 pounds of drilling equipment a distance of between 80 and 90 miles from the Diamond Field north of Waynesboro to a point near Lucedale for the sum of $1,824.02. The two substructures that were involved in this case weighed approximately 33,000 pounds. Rooney, testifying as a witness for the defendant, stated that McGill's sole business was hauling oil field equipment and supplies from one place to another; that McGill was a specialist in moving such equipment, and the men who were employed by McGill were specialists in their line; that McGill had a field supervisor whose duty it was to find out in advance where the drilling rig equipment was to be placed and to show the truck driver and swamper

where to locate the substructure; and that McGill's field supervisor was present at the drilling site at the time the substructures involved in this case were unloaded. Rooney stated that, usually, when the truck driver and swamper arrived at the new drilling site, the driller with some of his men, if present, would lend a helping hand for the placing of the drilling rig at the new location. On cross-examination Rooney admitted that McGill's employees were hired by McGill and that Mr. A. F. Wallace, Hurst's tool pusher or foreman, could neither hire nor fire McGill's truck driver or swamper.

J. P. Murray, Hurst's driller, who was in charge of the crew that Clark belonged to when he was injured, testified that it is the custom among oil drilling companies, that, when the tool pusher gets ready to move the oil drilling equipment from one location to another, he calls a trucking contractor and asks for so many trucks, tells the trucking contractor that he has a rig to move, and the trucking contractor sends his trucks and his swampers and drivers down. Murray said, "We don't pick the trucks out, and we don't pick the swampers or the drivers." Murray was then asked the following questions and gave the following answers: "Q. Does the driller have any say-so over the manner in which that equipment is moved? A. None whatever. Q. Does the driller have the right to hire or fire the truck driver or swamper? A. Not at all. * * * Q. Who rigged that substructure to move it from the point where it was to some other point when Mr. Clark was on the end of it and it fell? A. It was the swamper on the truck of Mr. McGill's. * * * That is what he is out there for, to tie on and untie and rig up for his truck driver anything that his truck driver might want to move. * * * Q. When you order them moved from one point to another, * * * do you have any control over the manner in which the trucking company moves those rigs from one place to another? A. None at all. * * *

Q. During your thirty years experience as an oil field worker and as a pusher, could you out on this job or could Mr. Wallace or could Mr. Hurst fire the driver or the swamper? A. No. sir.'' Murray stated that A. F. Wallace, Hurst's tool pusher, was not present at the drilling site at the time Clark was injured.

Harvey Mazingo, who was working with the plaintiff the day the plaintiff was injured, testified that McGill's man rigged the substructure, and that McGill's men had direct charge of how the substructure was rigged up to be moved.

Several witnesses were called to testify on behalf of the appellant concerning the alleged supervision exercised by Hurst's tool pusher or foreman over the unloading and placing of the substructures at the new drilling site. But there is no substantial evidence in the record to show that Hurst exercised any real control over McGill's truck driver or his helper other than to tell them what machinery was to be hauled and where it was to be unloaded and placed at the new drilling site and to caution them against injury to the substructure.

It is true that A. F. Wallace, Hurst's tool pusher, who was called to testify as a witness for the defendant, testified that he made the arrangements with McGill for the transportation of the equipment to the new drilling site and gave the orders and directions as to how and where to put the substructures, and that McGill's employees were under his control. But Wallace admitted on cross-examination that McGill had a field supervisor at the place where the substructures were being unloaded to direct the work of McGill's men and to see that the substructures were placed where Hurst wanted them placed, and that he left to McGill's men the decision as to how they got the substructures over there and set them in place; that he left that to McGill's men because they were experts in moving such sub-

structures. Wallace also admitted that he could not fire McGill's employees.

Of necessity there had to be cooperation between the employees of Hurst and McGill in the unloading and proper placing of the oil drilling machinery. But proof of the fact that Hurst's tool pusher or foreman made the arrangement with McGill for the transportation of the drilling equipment to the new drilling site and gave directions as to the placing of the substructures at the new drilling site and cautioned McGill's employees against injuring the substructures when they were being unloaded, in our opinion, did not in itself constitute such proof of control of McGill's employees by Hurst as to require a finding that the employees were the loaned servants of Hurst.

■■■ A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out to the servant the work to be done, or gives him directions as to the details of the work and the manner of doing it, or because the servants of the person for whom the work is being performed assist in the work. 57 C.J.S., 287, 288, Master and Servant, Par. 566, and cases cited. If the servant remains subject to the general orders of the person who hires and pays him, he is still his servant, although specific directions as to the work to be done may be given him from time to time by the other person for whom the work is performed. Such other person has the right to exercise the degree of control of the servant essential to secure the fulfillment of the agreement between the master and himself. Johnson v. Netherlands American Steam Nav. Co., 132 N.Y. 576, 30 N.E. 505; Standard Oil Co. v. Anderson, 212 U.S. 215, 226, 53 L. Ed. 480, 485, 29 Sup. Ct. Rep. 252; Driscole v. Towles, 181 Mass. 416; W. S. Quinby Co. v. Estey, 221 Mass. 56, 108 N. E. 908; McNamara v. Leipzig, 227 N.Y. 291, 125 N.E. 244, 8 A.L.R. 480; Ramsey v. New York

C.R. Co., 269 N.Y. 219, 199 N.E. 65, 102 A.L.R. 511; New Orleans B. R. V. & M. R.R. Co. v. Norwood, 62 Miss. 565.

In Standard Oil Company v. Anderson, supra, the Court held that one in the general service of another may be so transferred to the service of a third person as to become the latter's servant with all the legal consequences of the new relation; but to change the relation and relieve the master requires more than the mere fact that the servant is sent to do the work pointed out by such third party who has made a bargain with the master for his services.

In Rowell Equipment Company v. McMullan (1961), 241 Miss. 845, 133 So. 2d 631, this Court held that an employee of the equipment company which had contracted to repair an oil company's machinery when necessary was not when injured while repairing the machinery an employee of the oil company which could direct him where to work and what machinery to repair, but was still the employee of the equipment company which paid his salary and directed the details of his work.

The proof in the case that we have here, in our opinion, clearly shows that McGill's truck driver and swamper, who were engaged in unloading and placing the substructure at the time the plaintiff was injured, were the employees of McGill engaged in performing their master's work, and not the employees of Hurst. The direction and control of the loading, hauling, unloading and placing of the drilling rig machinery remained with McGill, and the fact that Hurst's employees lent a helping hand in the unloading of the machinery at the new drilling site and the fact that Hurst's foreman gave directions as to the proper placing of the machinery did not change the relationship between McGill and his employees or make McGill's truck driver and swamper the servants of Hurst.

It is next argued that the amount of damages awarded to the appellee was so excessive as to evince bias, passion and prejudice on the part of the jury, and that the court erred in refusing to grant the appellant's motion for a new trial on that account. But after a careful review of the evidence relating to the injuries suffered by the appellee as a result of the fall of the substructure, we are unable to say that the amount of the verdict is so excessive as to manifest bias, prejudice and passion on the part of the jury. The fixing of the amount to be awarded as damages in a personal injury case is peculiarly within the province of the jury, and with its decision this Court cannot interfere unless it is so large as to manifest bias, prejudice and passion on the part of the jury, and, as frequently stated, to shock the conscience of the court. In view of the serious nature of the injuries complained of, as shown by the medical testimony offered on behalf of the appellee, we are unable to say that the amount of the verdict is so excessive as to manifest bias, prejudice and passion on the part of the jury.

The record shows that the appellee was rendered unconscious as a result of the fall of the substructure on May 29, 1958, and was taken immediately to the George County Hospital at Lucedale, where he was given first aid treatment. He was later removed to the Forrest County General Hospital at Hattiesburg where he remained under treatment by Dr. Edward A. Attix for a period of fourteen days. When he regained consciousness he was suffering pain in his arms and back; his legs were numb for four or five days; and on June 8 he developed chills and fever, and Dr. Jack Daniels, a specialist in urology, was called in. The doctor found that he had a swelling of the prostate glands. A tube was inserted in his bladder. Approximately eighteen days elapsed before he had a bowel movement. The appellee was discharged from the Forrest County General

Hospital on June 12, and was carried to his home at Waynesboro. He continued to have chills and fever; and upon the advice of Dr. W. W. Walley he was carried back to the Forrest County General Hospital on June 17 and was again examined by Dr. Attix. He complained of pain in his back and around the tail bone, and a mileogram was performed. On July 7 he was still complaining of pain in the back and was fitted with a brace, which he continued to wear off and on until the time of the trial.

Dr. Walley testified that he continued to treat the appellee after he was released from the Forrest County General Hospital. The appellee continued to have trouble with his bladder and kidneys, and the doctor found that he had developed a kidney and bladder infection as a result of the insertion of a catheter in his bladder while he was in the hospital at Hattiesburg. X-rays were made of the lumbar and sacral area of the spine, and the radiologist reported that there was a fracture of two of the vertebrae. The appellee was hospitalized in the Wayne County General Hospital several times during the months of July, August and September. He continued to suffer pain thereafter and the doctor treated him at his office. The doctor stated that the appellee came to see him about once a week for a year, and after that time about once a month. The doctor stated that the appellee's testicles were swollen, and he prescribed an elastic bandage to support the weight. The doctor stated that the swelling of the appellee's testicles was caused by the infection of the kidneys and bladder which resulted from the insertion of the catheter, and the bruise which he had suffered when the substructure fell was ''what made him have to use the catheter.'' The doctor testified that, in his opinion, the appellee had not been able to do manual labor and had not been free of pain since he first saw him after his injury on May 29, 1958;

and the doctor was of the opinion that the appellee's injuries were of a permanent nature.

The jury had a right to believe that the appellee's earning capacity had been seriously impaired as a result of his injury; and we think there was no error in the action of the trial judge in overruling the appellant's motion for a new trial on the ground that the verdict was excessive.

We find no reversible error in the record, and the judgment of the lower court is therefore affirmed.

Affirmed.

*McGehee, C. J., and Ethridge, Gillespie and Jones, JJ.,* concur.