# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 90-CA-01206-SCT

*LUTHER MCGILL, INC.*

*v.*

*RICHARD T. BRADLEY AND LIBERTY MUTUAL INSURANCE COMPANY*

### ON PETITION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 9/25/90 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ANTHONY L. THAXTON |
| | ROBERT D. GHOLSON |
| | DOUGLAS S. BOONE |
| ATTORNEY FOR APPELLEES: | STANFORD YOUNG |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED - 5/16/96 |
| MOTION FOR REHEARING FILED: | 7/21/94 |
| MANDATE ISSUED: | 5/23/96 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This Court grants the petition for rehearing and the original opinions are withdrawn and these opinions are substituted.

### I.

¶2. A jury of the Jones County Circuit Court awarded Richard T. Bradley, an employee of MURCO Drilling Company, $10,000,000.00 for injuries he sustained as a result of the negligence of employees of Luther McGill, Inc. The jury further found each party, Bradley and McGill, to be fifty percent contributorily negligent, reducing the judgment against McGill by $5,000,000.00. McGill raises nine issues on appeal; we address only two: the propriety of the circuit court's denial of its motion for judgment notwithstanding the verdict and whether workers' compensation was Bradley's exclusive remedy. Finding no error, we affirm the jury verdict.

### II.

¶3. Nineteen-year-old Richard T. Bradley was paralyzed from the chest down as a result of an oil field injury sustained on February 13, 1985. A "floor hand" for MURCO Drilling Company, Bradley fell from a disassembled derrick rig to which he and other employees of MURCO and Luther McGill, Inc. were attempting to attach a wind wall. McGill had been hired by MURCO to assist in moving and erecting drilling equipment at a well site owned by Tomlinson Interests, Inc.

¶4. The wind wall was intended to protect workers from the elements during drilling operations. It was designed to move with the wind. The wall, a twelve-foot square metal sheet which folds in the middle, was supported by "H" beams approximately eleven to twelve inches wide. Although there was evidence that it was standard for a wind wall to have a tail rope tied to it, the wind wall in question was not so equipped.

¶5. On the day of the accident, David Cook, assistant to the crane operator, attached a chain to the center of the wind wall while it was lying on the ground. The chain, in turn, was attached to a thirty-five-foot cable that ran to the boom of the crane. It was critical to maintain proper tension on the lines to keep the wall from moving or folding during installation. The wind wall would then be attached to the upper derrick beam some twenty-five feet above ground. The crane operator employed by Luther McGill lifted the wind wall by raising the boom of the crane. The wall dangled in the wind until it was pinned to the derrick beam. Once in position for attachment to the beam, however, the crane operator engaged the brakes and locked the crane in place. Cook remained on the ground to give further directions to the crane operator.

¶6. It was Bradley's job, along with MURCO co-worker, Charles Cochran, to attach the wind wall to the derrick. Bradley and Cochran were working some twenty-five feet above the ground. The crane operator lowered the wind wall to a position where it could be attached to the H-beam, engaged the brakes and locked the crane in place. Bradley hammered his end of the wind wall in place on the derrick. Cochran, at the other end, was having difficulty pinning his end because he had no hammer. Seeing that Cochran needed assistance, Bradley ventured out on the H-beam, along the edge of the wind wall, to take his hammer to his co-worker. Along the way, the wind wall leaned, causing Bradley to lose his balance and fall to the ground.

¶7. What caused the wind wall to move was contested at trial. McGill relies on the testimony of several eyewitnesses who testified that a gust of wind preceded Bradley's fall. Bradley maintained that negligence on the part of the crane operator--either failure to keep the cables sufficiently taut or to keep a proper watch on the wind wall and his crane--was responsible. Bradley's expert on crane operation testified that the crane operator must have "moved" at least one of the crane's functions for the wind wall to lean over far enough to knock Bradley off the beam. He further testified that the crane operator should have watched the wind wall at all times. However, McGill's crane operator admitted that he had not kept his eyes on the crane or the wall. As he testified, "I don't know if I was holding it steady or not because, like I said earlier, I wasn't watching it. I was talking to my swamper there on the ground."

¶8. On January 20, 1989, Bradley filed a third party tort action against Luther McGill, Inc., in the Circuit Court of the Second Judicial District of Jones County. Liberty Mutual Insurance Company, MURCO's workers' compensation carrier, intervened, asserting its subrogation right.

¶9. A jury set Bradley's damages at $10,000,000, but found that he was fifty percent contributorily negligent. The circuit court accordingly entered a judgment against McGill in the amount of $5,000,000, plus costs and interest. McGill's post-trial motion for judgment notwithstanding the verdict, or in the alternative, for a new trial, was denied.

## III.

¶10. When reviewing the denial of a motion for a JNOV, this Court is bound to

> consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.

*Munford, Inc. v. Fleming*, 597 So. 2d 1282, 1284 (Miss. 1992) (quoting *Litton Systems, Inc. v. Enochs,* 449 So. 2d 1213, 1214 (Miss. 1984)). A trial court judge should set aside a jury verdict only when it is apparent that the verdict is against the overwhelming weight of the evidence, and a trial court judge's decision must stand unless there is a showing of an abuse of discretion. *Andrew Jackson Life Insurance Co. v. Williams*, 566 So. 2d 1172, 1177 (Miss. 1990); *Rester v. Lott*, 566 So. 2d 1266, 1268 (Miss. 1990). We are reminded that the jury's decision is afforded great deference because of the jury's position to evaluate and weigh the evidence and the truthfulness of the witnesses' testimony:

> The demeanor or bearing of voice, the attitude and appearance of the witnesses, all are primarily for inspection and review by the jury. The jury not only has the right and duty to determine the truth or falsity of the witnesses, but also has the right to evaluate and determine that portions of the testimony of any witness it will accept or reject.

*Andrew Jackson Life Insurance Co. v. Williams,* 566 So. 2d at 1177 (quoting *Traveler's Indemnity Co. v. Rawson*, 222 So. 2d 131, 134 (Miss. 1969)).

¶11. McGill contends that the verdict was based on circumstantial evidence and reflects the sentiments of a jury overwhelmed by sympathy for the victim. It is not this Court's role to assign blame or to speculate as to what might have been done to change the course of events now before us. However, looking, as we must, at the evidence in a light most favorable to Bradley, we find that there is ample evidence--as well as inferences that may be drawn therefrom -- to support the jury's verdict. Eyewitnesses report that there was a breeze at the time of the accident. Indeed, there was a meteorologist's testimony that the wind could have been blowing at twelve to fourteen miles an hour at the site. However, expert testimony as well as a video of an experiment conducted by McGill indicated that the wall would not have been moved by winds of that velocity. Further expert testimony indicated that some movement by one of the crane's functions -- affecting the tautness of the lines securing the wind wall -- would have caused the wall to lean to the extent that it did. Notably, none of the eyewitnesses were watching either the crane or the boom at the time of the accident, so none were aware of any movement by the equipment. Finally, the crane operator admitted in attentiveness, that at the time of the accident, he was talking to his "swamper" on the ground. Expert testimony indicated he should have been watching the wind wall at all times until it was securely pinned in order to avoid movement by the wall.

## IV.

¶12. McGill filed a motion for summary judgment alleging that it was immune from suit because workers'

compensation was Bradley's exclusive remedy. Finding that McGill was an independent contractor as a matter of law, the circuit court overruled the motion. We are of the opinion that ***W.J. Runyon & Son, Inc. v. Davis,*** 605 So. 2d 38 (Miss. 1992) controls in this case.

¶13. MURCO's manager, Oscar Bradley, Jr., hired Luther McGill, Inc., which was engaged in the business of moving oil rigs, to assist the driller in moving and erecting the drilling equipment at the well site. MURCO employees told the McGill foreman what needed to be done; he, in turn, supervised the McGill employees. The superintendent of MURCO had the authority to discharge McGill, but not to hire or fire any specific McGill employees. Thus, McGill was sufficiently outside of MURCO's right to control to assume responsibility for the torts of its employees. ***Runyon***, 605 So. 2d at 45. *See also* ***Luther McGill, Inc. v. Clark***, 244 Miss. 509, 146 So. 2d 338 (1962); ***Clark v. Luther McGill, Inc.,*** 240 Miss. 509, 127 So. 2d 858 (1961)(McGill found to be independent contractor under circumstances similar to the case *sub judice*).

### V.

¶14. As an appellate court, we do not assign blame or speculate as to what might have been done to change the circumstances of the cases before us. Some on this Court, if on the jury, may have rendered a different verdict; but we cannot say, based on the evidence and inferences that may be drawn therefrom, that this verdict must be overturned. Looking at the evidence in a light most favorable to Bradley, we find that the jury verdict is supported by the evidence in the record now before us. The circuit court properly denied McGill's motion for a j.n.o.v. Further, since McGill was an independent contractor, the circuit court did not err in denying its motion for summary judgment on the workers' compensation issue. Accordingly, we affirm judgment in the amount of $5,000,000.00 plus costs and interest.

¶15. **JUDGMENT IS AFFIRMED.**

**LEE, C.J., SULLIVAN, P.J., PITTMAN, BANKS AND ROBERTS, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY PRATHER, P.J., AND MILLS, J.**

**SMITH, JUSTICE, DISSENTING:**

¶16. Undisputedly, Richard Bradley received a grievous, heart-breaking injury. However, this Court in loading the shoulders of an innocent crane operator with blame for this accident for the rest of his life is not, in this writer's opinion, a proper solution of the issue.

¶17. The derrick was lying on the ground, and the employees of both Luther McGill and Murco were engaged in the task of attaching a wind wall to the derrick. The purpose of the wind wall was to protect workers in cold weather from the elements during drilling operations. The wind wall was approximately twelve feet square and folded in the middle. "H" beams approximately 11-12 inches wide supported the derrick when erected.

¶18. The way the wind wall was attached to the derrick was as follows: padeyes were fixed at each end of the wind wall, and a pin would be hammered through the wind wall padeye and a corresponding padeye on the derrick beam.

¶19. On this February morning in 1985, David Cook, assistant to the crane operator (hereinafter swamper), attached a chain to the center of the wind wall while it was lying on the ground. The chain in turn was attached to a 35-foot cable that ran to the boom of the crane. The objective was to attach the wind wall to the upper beam some 25 feet above ground. The crane operator, Bonnie Ray Sims, a Luther McGill employee, lifted the wind wall by raising the boom of the crane. The wind wall dangled in the wind until it was pinned to the derrick beam. Once it became positioned to be attached to the beam, however, the crane operator engaged the brakes and locked the crane in place. Bradley and Charles Cochran were two Murco employees whose job that day was to attach the wind wall to the derrick.

¶20. To appreciate the situation one must visualize the H beam on the derrick. Only eleven or twelve inches of space existed in between sides raised four or five inches. Bradley and Cochran were some 25 feet above ground. Sims lowered the wind wall in a position to be attached to the H beam and engaged the brakes and locked the crane in place, waiting Cochran and Bradley to pin the wind wall to the derrick. Bradley hammered his end of the wind wall in place on the derrick. Cochran at the other end was having difficulty pinning his end because he had no hammer. Cook, the swamper, was there on the ground to give further directions to crane operator Sims as needed.

¶21. Without anyone directing him to do so, Bradley on his own decided to take his hammer to Cochran. To do so, he had to place his heels together, the front of his feet at a wide angle outwards and move along the edge of the wind wall.[1]

¶22. While engaged in this undertaking Bradley fell to the ground and suffered an injury which permanently paralyzed him from the chest down. He was just a few days before reaching his twentieth birthday, and single at the time.

¶23. There is no proof that Cook or Sims did anything to cause the wind wall to move. Following the accident, it was the version of all employees who witnessed the accident that on this February morning a puff of wind caused the wall to move while Bradley was moving sideways on the H beam, knocking him off balance.

¶24. On the evening of February 13, 1985, Bradley told his doctor at the University of Mississippi Medical Center that "he had been working on an oil well platform and a strong wind had blown and he had fallen twenty feet."

¶25. Willie Ed Doggett, approximately twenty feet from the crane, said a puff of wind blew the wind wall and Bradley turned around and tried to make his way out from behind it but he fell. He also said neither the crane nor line moved.

¶26. J. W. Leggett saw Bradley falling. The boom did not move. In his opinion it was a puff of wind which moved the wind wall.

¶27. David Cook said, "All of a sudden the wind blew it up against him there and he lost his balance."

¶28. Oscar Bradley wrote on the workers' compensation form about two weeks after the accident: "Wind blowed [sic] wall into him causing him to fall approximately 20 to 25 feet to the ground."[2]

¶29. The lawsuit was filed four years after the accident, January 20, 1989, which strongly suggests that no one suspected anything other than wind had caused the wind wall to move until at least two or three years

after the accident.

¶30. Bradley claimed that Bonnie Sims had somehow let the crane move, thereby moving the wind wall. *No proof whatever that this actually happened came from any witness*. At most, Bradley offered expert testimony from examination of weather records at Jackson airport that there was not enough wind that day to move the wind wall. A plaintiff's expert and not eyewitnesses conceded that a person at the scene would know best about the wind.

¶31. Suppose, argumentively, that the wind wall for some reason did move, and we do not know the reason. The majority faults Sims. Where was Sims at fault? He had locked the machine in place. The critical flaw in Bradley's case is that with the crane locked in place, there was absolutely nothing more that Sims could do.

¶32. An appendix[3] is attached with a summary of each eyewitness as well as that of Bryan Martin, Bradley's expert. Martin's only suggestion of any employee's negligence was that Sims should have been keeping his eye on Cochran and Bradley, not looking at or talking to Cook, Sim's swamper. The swamper's job is to give directions to the crane operator. The crane operator, Sims, is high up in the air and some distance from the wind wall that is suspended at the end of a chain on the end of a cable. Cook is on the ground to give directions as needed. How can Sims be faulted for speaking to or looking at Cook? This was perfectly reasonable and natural that was Sims job to look at Cook for any directions concerning the crane. Having locked the crane in place, who else should he have been looking towards other that to Cook? Suppose, however, he had been looking right at Bradley as he started out on that perilous adventure? What could he have done except yell "Don't!"? He certainly would have been afraid to move the crane with Bradley moving along the H beam. The record is replete with testimony that one had ever seen a person attempt to walk unsupported on an H beam in the manner that Bradley did when a wind wall was position as in this case. Also, several employees testified that they instantly knew that Bradley was about to be seriously injured attempting this maneuver.

¶33. There simply was no proof of any negligence by McGill. While there was no proof of **any** negligence, the sympathy of the jury is evident in its assessment of blame. If there was any negligence at all on the part of McGill, by any stretch of imagination, it could only have been minimal. Bradley's negligence, on the other hand, was foolhardy in its recklessness. The truth is, Bradley needlessly and voluntarily placed himself in an ultrahazardous position, without regard to his own safety. Indeed, Bradley reluctantly acknowledged his precarious position at trial, by acknowledging that he was standing awkwardly on a beam some twenty-five feet above the ground with absolutely nothing to hold on to and no margin for error. In order to walk down the beam, Bradley could not come close to walking normally. Recklessness of this nature causing injury to someone else would have subjected him to punitive damages. Bradley could have utilized several alternatives to his irresponsible attempt to walk an H-beam.

¶34. What did the jury do? By its verdict it assessed Bradley and Luther McGill **equally** at fault.

¶35. One cannot read this record without a great sense of sadness at the fate of Bradley. If there were some negligence on the part of the employees of Luther McGill, our responsibility would be clear to affirm an award of damages. Such is not the case, however.

    (1) Bradley could have tied a line to the hammer and thrown the line over to Cochran; or

(2) Bradley could have climbed back down the derrick the way he came up, walked around to the other end, and gone back up the derrick the same way Cochran did to deliver the hammer; or

(3) Bradley could have requested someone else to deliver a hammer to Cochran.

¶36. Bradley's own testimony is indeed revealing. Bradley concedes that a difference of just a few inches would be sufficient to cause him to lose his balance and further concedes that he did not see the cable. Bradley testified that he did not see any slack come into the cable, did not see the boom move, and was not in a position to see them move. Bradley told his doctor shotly after the accident that the wind had blown him of the beam. Bradley's argument here tht the wall leaned to a 45 degree angle is contrary to the testimony of Wayne Wright, who is characterized by Bradley as the only independent eyewitness. Write testified conclusively that the wall only moved six to twelve inches on the date of the accident. Finally, if the crane operator had indeed physically manipulated the controls of the crane in such a fashion as to allow the wall to move to a 45 degree angle, the eye witnesses would have necessarily seen the operator take action to right the wall after the fact. The record contains no reference to any such corrective action on the part of the crane operator. Thus, the conclusion reached by Bradley is unsupported by any credible evidence.

¶37. I respectfully dissent.

**PRATHER, P.J., AND MILLS, J., JOIN THIS OPINION.**

# A P P E N D I X

In his opening statement, plaintiff's counsel promised the jury that Charles Cochran would testify that "slack came in the cable and the wind wall leaned over and knocked him off." **R.VII, 48**. He also promised that Wayne Wright "will say slack came in the cable and knocked Mr. Bradley off." **R.VII, 49**. Neither witness testified to any such thing. Here is what each of the witnesses at the scene did testify:

**DAVID COOK**

(Direct):

Q. And describe, if you would, what you saw that day?

A. I tied on the wind wall and we put it up there in place, and he pinned his side. Bonnie Ray said something to me, and I turned to see what he said.

When I turned back around and looked back up to where they was [sic], Richard had walked behind the wall there. All of a sudden, the wind blew it up against him there, and he lost his balance and fell off. **R.VIII, 354**.

. . . .

(Cross-examination):

(After first asking Cook if he had not given counsel a statement on January 4, 1989, and Cook saying he had)

Q. At that time, I asked you what happened, and you said the wind wall leaned over and knocked him off the beam, and is that still your opinion?

A. Yes, sir, when the wind blew.

Q. And your opinion is that the wind caused it to move over; is that right?

A. Yes, sir. **R.VIII, 355**.

## CHARLES O. COCHRAN

I was pinning the wind wall, and Richard had his end pinned, and I was trying to get mine pinned. I had mine pinned -- I had the pin about half way in.

I needed a hammer to knock the pin in. I asked some of the guys on the ground to hand me a hammer or something, and some of them went to find one, I guess. I was working with it, and then I heard Richard holler. I looked up and the wind wall was leaning over on him and knocked him off. **R.VII, 118**

Cochran further testified that when Bradley was coming towards him the wind wall was straight up and down. **R.VII, 122-123.** He said the wind wall had been in position for at least ten minutes when Bradley was injured. **R.VII, 124.** He was not looking at the crane and could not testify whether any of it moved or not. **R.VII, 125**.

## KEITH PALMER

Palmer was on the ground about 25 feet from the accident. He said the wind wall "come into him like that and knocked him off." **R.VII, 133**. He estimated the wall moved about a foot. He did not know what happened "as far as the crane was concerned." He did not see the crane move: "I just seen the wind wall move."

## ROBERT W. IRWIN

Irwin caught something out of the corner of his eye, and looked around and Bradley was on the ground. **R.VII, 142**. He knew nothing about what happened insofar as causing the accident. **R.VII, 145**.

## WAYNE WRIGHT

Wright was 75-100 yards from the accident. He noticed Bradley starting across, and remarked: "Jim, that boy there is getting ready to get hurt real bad." **R.VIII, 228**. He said he did not know what happened, but the wind wall moved, and caused Bradley to lose his balance, and he fell over backwards. **R.VIII, 221**. He said Bradley had got about half way across when the wall moved in his estimation about six-to-twelve inches, he did not know how far. He said the wind was blowing, and admitted that in his deposition he had testified it was blowing into the back side of the wind wall.

## BONNIE RAY SIMS

Sims had locked the boom into place and was sitting there holding it while Cochran and Bradley were pinning the wind wall into place. He was talking to Cook when he looked up just as Bradley was falling. He said either Cook or one of the hands would give him signals. He testified he did not move the line because he "had the brake locked down." **R.VIII, 242**.

He testified that if the ground was level and the wind was calm, he could hold it steady. He surmised that if the machine was worn it might move. He did not know whether it was or not. He was not in a position to see whether the crane or line moved. **R.VIII, 247**.

## WILLIE ED DOGGETTE

Doggette was a truck driver, parked only a few feet from the derrick and could see the operation in full view through his windshield. He said he saw the wind wall move. "Yeah, it come a puff of wind and the wind wall moved a little." **R.VIII, 323**. When the wind wall moved, "It looked like he turned around and tried to make his way out from behind it, but he fell." He was looking straight at the wind wall, line and crane boom. He did not see the line or crane move, only the wind wall. **R.VIII, 323**.

## J. W. LEGGETT

Was standing by the crane. He could not say what caused the wind wall to move, but the wind was blowing at the time. The crane was stationary, and he did not see the boom move. **R.VIII, 330**.

He said it was cool that day, the wind would blow and then it would quit for a while, and then start again. **R.VIII, 339**.

## BRYAN MARTIN

The expert witness. A high school graduate with two years vocational training. For a period of a week, he received training at a crane manufacturer's in Iowa. Another week on another occasion was spent at "Industrial Air and Hydraulics," location not clear from record. For the wind wall to have moved, in his opinion, one of the crane's five "functions" would have had to move: (1) boom, (2) load line, (3) "auxiliary hoist, which is the fast line, and which was actually hooked to the wind wall," (4) the "swing," "you can swing to the left and you can swing to the right," and (5) tracks. **R.VIII, 261**. It could have been any one of them, in his opinion. **R.VIII, 289**. He also admitted on cross-examination that he had testified in his deposition that his opinion was based upon the assumption that wind was **not** a factor. All eyewitnesses testified there **was** wind. **R.VIII, 286**.

The only fault he found with Sims was that he should have been keeping his eyes on Cochran and Bradley, not looking at or talking to Cook.



1. To duplicate somewhat the feat Bradley attempted, a person could face a wall and move along it with the feet not extending over twelve inches at most from the wall.

2. In fairness it should be noted that Mr. Bradley did not see the accident, but only reported what was told him. Also, Richard Bradley probably would not have felt any wind, himself, behind the wall. His statement

to the doctor could have simply been his opinion.

3. The appendix and a substantial portion of this dissent is taken from the original opinion of former Chief Justice Armis E. Hawkins.